108 P.3d 946

Gary D. SMETHERS, M.D., a single man, Plaintiff–Appellant,

v.

Michael CAMPION, M.D., and Elena Campion, husband and wife; Southwestern Eye Center, Ltd., an Arizona corporation, Defendants–Appellees.

No. 1 CA–CV 04–0117.

Court of Appeals of Arizona, Division 1, Department C.

March 22, 2005.

Treon, Aguirre & Newman, P.A. By Arthur G. Newman, Jr., Sharon G. Slifko, Phoenix, Attorneys for Plaintiff–Appellant.

Broening Oberg Woods & Wilson, P.C. By Michael J. Ryan, Cynthia Y. Kirkland, Mesa, Attorneys for Defendants–Appellees.

## OPINION

WINTHROP, Judge.

¶ 1 Gary Smethers, M.D., appeals from the defense verdict and judgment in his medical malpractice action against Michael Campion, M.D., and Southwestern Eye Center, Ltd. ("Southwestern"). Dr. Smethers asserts that the trial court improperly restricted his questioning of a defense expert during the trial. For the reasons discussed, we reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Dr. Smethers had been a patient at Southwestern since June 21, 1990. In nine years, his contact lens prescription had never changed and the eleven eye measurements taken during that time were virtually the same.

¶ 3 In September 1999, Dr. Smethers asked Dr. Albert J. Scheller, his eye doctor at Southwestern, about LASIK surgery.[1] Dr. Scheller told him it was a good procedure and recommended Dr. Campion, another Southwestern doctor, who had performed numerous LASIK procedures.

¶ 4 On October 1, 1999, Dr. Smethers saw Dr. Campion for a LASIK surgery evaluation. Dr. Smethers arrived wearing his contact lenses, and the medical staff told him to remove them so they could perform refractions and other measurements. After Dr. Campion examined him and discussed the surgery, Dr. Smethers decided to have the LASIK procedure. Surgery was scheduled for November 5, 1999.

¶ 5 Wearing contact lenses affects the shape of the cornea. Removal of the lenses for several days preoperatively allows the patient's corneas to resume their natural shape. Dr. Smethers had therefore been instructed to remove his lenses on Sunday evening (October 31) and leave them out until the surgery on November 5, which he did. However, instead of repeating the measure-ments upon which the corrective surgery would be based, Dr. Campion chose to perform the surgery based upon his review of the eleven sets of measurements that had been taken of Dr. Smethers' eyes over the preceding nine years, including the measurements taken on October 1.

¶ 6 The surgery resulted in an "over-correction" of Dr. Smethers' corneas. As a result, Dr. Smethers' vision deteriorated after the surgery, and he needed frequent changes to his eyeglass prescription due to fluctuating vision and visual defects causing glare, halos, ghosting, starbursts and other problems. Dr. Smethers also was required to carry multiple pairs of glasses with different prescriptions, as well as a magnifier, to allow him to function in differing light conditions.

¶ 7 Dr. Smethers sought the advice of eye specialist Samuel Masket, M.D. Dr. Masket told him that further corrective surgery was not an option, and referred him to another specialist for custom contact lenses. Eventually, Dr. Smethers was fitted with gas-permeable rigid contact lenses that give him somewhat adequate day vision, although he still has glare and other problems and needs a magnifier to read.

¶ 8 Dr. Smethers filed this medical malpractice case against Dr. Campion and Southwestern, and retained Dr. Masket as his medical expert. Dr. Masket criticized Dr. Campion for relying on the eleven prior measurements and for the laser settings based on such measurements. With regard to the measurements, Dr. Masket testified that, when LASIK is performed on patients who wear contact lenses, the standard of care is to remove the lenses for several days before taking preoperative measurements. He explained that the measurements must be based on the natural shape of the cornea, and because contact lenses alter the shape of the cornea, removal of the lenses for several days to restore the natural shape of the cornea is necessary for accurate measurements. Dr.

---

1. LASIK, an acronym for laser-assisted in-situ keratomileusis, is a type of corrective eye surgery. During the procedure, the surgeon uses a microkeratome to create a thin, circular flap in the patient's cornea. The flap is folded out of the way, and a laser is used to ablate (remove) small amounts of corneal tissue to "reshape" the cornea. This allows a better focus of light into the eye and onto the retina, which results in clearer vision.

Masket testified that Dr. Campion therefore breached the standard of care by taking Dr. Smethers' measurements on October 1, 1999, right after Dr. Smethers had removed his lenses, and by failing to re-measure the eyes after Dr. Smethers' lenses had been out several days. Dr. Masket testified that this failure to re-measure was probably the cause of both the over-correction and Dr. Smethers' resulting visual problems.

¶ 9 Defendants retained Dr. Perry Binder as their medical expert. In his pre-trial deposition, Dr. Binder testified that Dr. Campion's decision to rely on the eleven prior sets of measurements instead of re-measuring Dr. Smethers' eyes complied with the standard of care. However, Dr. Binder also stated that, in his own practice, he would have re-measured before proceeding with surgery.

¶ 10 Prior to trial, defendants filed a motion *in limine* to preclude evidence regarding the experts' personal practices, particularly those of Dr. Binder. That motion was granted.

¶ 11 The case proceeded to a jury trial that resulted in a defense verdict. The court entered judgment in favor of defendants, and Dr. Smethers timely filed this appeal. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## ANALYSIS

¶ 12 In medical malpractice actions, like all tort actions, a plaintiff must allege and prove the existence of a duty owed, a breach of that duty, and damages causally related to such breach. Generally speaking, whether a duty is owed is a question of law for the court. *Stanley v. McCarver*, 208 Ariz. 219, 221, ¶ 5, 92 P.3d 849, 851 (2004). The elements of breach and causation, and the measure of damages, if any, are generally questions for the trier of fact. *Fehribach v. Smith*, 200 Ariz. 69, 73, ¶ 16, 22 P.3d 508, 512 (App.2001); *Sheppard v. Crow–Barker–Paul*

*No. 1 Ltd. P'ship*, 192 Ariz. 539, 549, ¶ 53, 968 P.2d 612, 622 (App.1998).

¶ 13 In this case, the duty owed by Dr. Campion in relation to his patient, Dr. Smethers, was "to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances." A.R.S. § 12–563(1) (2003).[2] In other words, to meet the duty owed, Dr. Campion was expected to conform his professional actions with how a reasonably prudent eye surgeon in Arizona would act in the same or similar circumstances. This yardstick by which a physician's compliance with such a duty is measured is commonly referred to as the "standard of care."

¶ 14 Although the statute in words outlines the duty, it does little to identify how the standard of care is determined. While the standard clearly is not the "highest degree" of care or skill, *see Butler v. Rule*, 29 Ariz. 405, 417–18, 242 P. 436, 440 (1926), it is at least a minimum level of skill and care practiced by a community of physicians, as measured by the circumstances and facts of a given case. In that regard, the standard of care of necessity is not static, but rather must be flexible and fluid, and dependent upon the nature of the medical situation.

¶ 15 In light of the scientific advances in the diagnosis and treatment of physical conditions and diseases, the standard of care evolves and is subject to change. Further, because a significant component of diagnosis and treatment is the practitioner's exercise of judgment, there are, understandably, different viewpoints as to how a medical condition may be identified, evaluated and treated. Those differing viewpoints can be and are commonly expressed in the medical community in medical schools, post-graduate training programs and professional meetings, and also through textbooks and other medical literature. Over the years, some ideas advanced in texts or medical journals, controversial when posed, have become well-accept-

2. We cite the current version of the applicable statute when no revisions material to this deci- sion have occurred.

ed and routinely followed. Other ideas and concepts, enthusiastically embraced at the onset, have fallen from favor and can no longer be considered authoritative on the particular subject.

 ¶ 16 Accordingly, the parameters of the standard of care applicable in a given case, and whether such standard was complied with, are often vigorously advocated to the trier of fact through the opinion testimony of "expert" medical witnesses. As a foundational element, each such expert must establish that he or she is qualified to offer an opinion on the subject matter involved. Generally, that means that the witness must possess sufficient education, training and experience concerning a subject relevant to the action that will assist the trier of fact in resolving one of the disputed issues in the case. *See generally* Ariz. R. Evid. 702. As it relates to the standard of care, such proffered expert must generally practice or have sufficient training and experience in the same area of practice as the defendant physician so as to be in a position to opine on what the applicable standard of care is for a given situation, and whether the defendant complied with the same in the care and treatment of the patient.

 ¶ 17 The advent of specialty residency programs, the use of standard textbooks and reference to specialty-oriented medical literature, the use of national testing and certification for such specialty, and the creation of and membership in specialty professional organizations are intended to create a consensus and to encourage uniformity in the diagnosis and treatment of a disease or condition.[3] Accordingly, the statewide standard of care for physicians practicing in a discrete specialty such as corrective eye surgery may reflect a "national" specialty standard of care; in other words, the degree of care, skill and learning exercised by reasonably prudent specialists in such field across the country.[4]

¶ 18 Several years ago, these medical cases were, to a large extent, a "battle of the experts." In that regard, each side would often elicit expert opinions on standard of care and causation from multiple physicians, both those independently retained and those doctors involved in the care and treatment of the patient. In many ways, this did not make the jury's duty any easier to perform, and only served to substantially increase the length of the trial and the attendant cost. Accordingly, Rule 26(b), Arizona Rules of Civil Procedure, was amended and, barring unusual circumstances, each party is now allowed to call only one expert for any given issue.[5]

¶ 19 This does not mean, however, that the role of the expert witness is any less important in such trials today. To the contrary, the strength of a party's case may well depend on the credibility of his or her designated expert. With the parties limited in the number of experts that can be utilized, the jury's focus on such expert's opinions and credibility is heightened. Jurors are routinely given certain standard instructions concerning experts that emphasize their role, and provide direction as to how an expert's opinion should be considered and either adopted or rejected, in whole or in part. The standard instruction regarding the credibility of witnesses is as follows:

---

3. While such professional specialty organizations such as the American College of Radiology and the American College of Obstetricians and Gynecologists have published "Standards" and "Guidelines," we caution that such written comments, standing alone, do not establish the standard of care for any given situation. The existence and content of such standards or guidelines, however, may be helpful to a jury in determining the parameters of the applicable standard of care and whether, under the circumstances of a given case, that standard was met by the defendant health care provider. *See Stanley*, 208 Ariz. at 224 n. 6, 92 P.3d at 854 n. 6.

4. *See McGuire v. DeFrancesco*, 168 Ariz. 88, 90–92, 811 P.2d 340, 342–343 (App.1990). As illustrated by this case, both parties' experts are corrective eye surgeons who practice their specialty in California, not Arizona.

5. In a medical malpractice case, in addition to calling an independent expert on the standard of care, the defendant health care provider is also allowed to offer an opinion concerning his or her compliance with the standard of care. *See* Ariz. R. Civ. P. 26(b)(4)(D).

In deciding the facts of this case, you should consider what testimony to accept, and what to reject. You may accept everything a witness says, or part of it, or none of it.

In evaluating testimony, you should use the tests for truthfulness that people use in determining matters of importance in everyday life, including such factors as: the witness's ability to see or hear or know the things the witness testified to; the quality of the witness's memory; the witness's manner while testifying; whether the witness had any motive, bias, or prejudice; whether the witness was contradicted by anything the witness said or wrote before trial, or by other evidence; and the reasonableness of the witness's testimony when considered in the light of the other evidence.

Consider all of the evidence in the light of reason, common sense, and experience.

Rev. Ariz. Jury Instr. ("RAJI") (Civil), at 21 (3d ed.1997). The standard instruction regarding an expert witness is as follows:

A witness qualified as an expert by education or experience may state opinions on matters in that witness's field of expertise, and may also state reasons for those opinions.

Expert opinion testimony should be judged just as any other testimony. You are not bound by it. You may accept it or reject it, in whole or in part, and you should give it as much weight as you think it deserves, considering the witness's qualifications and experience, the reasons given for the opinions, and all the other evidence in the case.

RAJI (Civil), at 22.

¶ 20 The primary standard of care issue advanced by Dr. Smethers at trial was that Dr. Campion had failed to re-measure the patient's eyes on the day of surgery, and instead had relied upon one set of measurements, taken some weeks earlier, and historical measurements taken by Dr. Smethers' regular treating opthalmologist, Dr. Scheller. As previously stated, the premise to Dr. Smethers' argument is that the fact that he regularly had worn contact lenses in all probability had changed the shape of his corneas

and resulted in misleading measurement data, because an insufficient period of time had passed between removing the lenses and the definitive measurements. The literature and the expert testimony varied somewhat as to what length of time would have to have elapsed after the lenses had been removed before the corneas would have returned to a "normal" shape for accurate measurements. In this case, it is not entirely clear from the evidence, but it appears the parties agreed that, like the measurements obtained on October 1, 1999, the historical measurements obtained by Dr. Scheller were obtained immediately after Dr. Smethers had removed his contact lenses in the office. Accordingly, Dr. Smethers argued to the jury, it was not reasonable for Dr. Campion to have relied on the accuracy of those measurements in justifying his decision not to repeat the measurements on the day of surgery. If those historical measurements were not reasonably reliable for comparison, then Dr. Campion had no way to reliably determine whether the corneas were "stable" enough to allow for accurate correction through the scheduled LASIK surgery. At trial, Dr. Campion, both individually and through his retained expert, Dr. Binder, argued that Dr. Scheller's historical measurements were reliable enough to use for comparative purposes, and therefore he was not required to re-measure Dr. Smethers' corneas on the day of surgery.

¶ 21 Prior to trial, the deposition of Dr. Binder was taken by counsel for Dr. Smethers. Without question, Dr. Binder's training and experience in corrective eye surgery rendered him well-qualified to opine on the standard of care and causation issues presented. Dr. Binder supported the judgment of Dr. Campion, and testified that it was within the standard of care to proceed to surgery without taking any additional measurements to confirm the accuracy of the measurements taken several weeks earlier, and at a time when the patient had just removed his contact lenses. However, Dr. Binder also testified that, in his own medical practice, he would require that the patient with hard contact lenses have the lenses out for a month for the eye to "normalize," *i.e.*, so that accurate measurements could be obtained,

before any measurements were taken upon which corrective surgery would be based. For a patient who regularly wore soft contact lenses, like ·Dr. Smethers, Dr. Binder would require that the lenses be out for seventy-two hours before pre-operative measurements were obtained:

Q. What is your opinion as to what the standard of care requires when you've got a contact lens wearing patient who comes in for a consult and measurements?

. . . .

[DR. BINDER]: Well, I'm not the person that tells you what standard of care is in the world, or in the United States, or in Arizona, or in California. I can just tell you what I think it is for my practice, the way me and my partner practice. And with hard lenses, even though the recommendations by the [Food and Drug Administration] are two weeks, we wait a month. The reason is because of what I told you earlier; the changes are more dramatic with hard lens wearers than with soft lenses. *72 hours out of lens wear is what we like to have for our patients.*

. . . .

Q. Now, Gary Smethers had been wearing extended-wear soft contact lenses for 15 years. He wore them, I think, for two weeks at a time, and he slept in them. *So would you tell him, if he came in to see you, that he needed to have them out for 72 hours?*

. . . .

[DR. BINDER]: *Yes. I would tell him 72 hours or longer. I would check that prescription that I measured with the glasses that day that I got in my office, assuming he didn't have any glasses, against what his contact lens prescription might be. There's a way you can judge those two things. If they're relatively similar, then I'll tell them, sir, the numbers we're dealing with today pretty much give me an idea of what you may have; but to make sure I have, you need to come back and see me out of your lenses for 72 hours so I can check you again.*

Maybe he says, I live out of town. I want the surgery done. It's Tuesday. I want the surgery on Friday. Can I have it on Friday?

*I'd say, Come here on Friday, and I'll re-measure you again. And if your numbers are the same as they are today, I'll do your surgery; but if they've changed pretty significantly, a half or three quarters of a diopter, I'm sorry, I won't be able to do your surgery.*

. . . .

Q. And it's your opinion that Dr. Campion met all applicable standards of care in his care and treatment of Gary Smethers; is that correct?

A. Based on [D]r. Smethers' previous history, yes.

. . . .

Q. Now, do you believe it is within the standard of care to remove his extended wear contacts on the day of the examination and do the measurements, and not do another set of measurements?

A. That statement, taken out of context, would sound inappropriate. But if a patient's been followed, as I believe I said, for many years, and has had the same prescription, and he was an age well beyond the time due to his maturing, I think that was acceptable.

(Emphasis added).

¶ 22 Prior to trial, defense counsel filed a motion *in limine* to preclude cross-examination of Dr. Binder on his "personal practices," arguing that such practices did not equate to the standard of care. Dr. Smethers' counsel argued that how Dr. Binder treated his own patients was relevant, and would assist the jury in determining the parameters of the applicable standard of care. The trial court granted the motion, articulating the following rationale for its ruling:

The Court finds that said testimony by Dr. Binder is not relevant. The only relevant testimony of Dr. Binder is whether Dr. Campion fell below the standard of care. To allow Dr. Binder or for that matter, any expert to testify as to what their personal practices are, would be confusing to the jury.

¶ 23 Dr. Smethers filed a Motion for Reconsideration. He urged the trial court to

allow the admission of Dr. Binder's deposition testimony, at least for purposes of impeachment, and proposed a limiting instruction indicating that Dr. Binder's personal practices did not by themselves establish the standard of care but that the jury could consider such evidence for the limited purpose of deciding whether to accept or reject Dr. Binder's testimony as to what the standard of care required in the circumstances of this case. The motion was denied by the court on the morning of the first day of trial.

¶ 24 At trial, Dr. Smethers presented the opinion testimony of Dr. Masket, another well-qualified eye surgeon. Dr. Masket testified that, in his opinion, Dr. Campion's judgment fell below the standard of care when Dr. Campion proceeded to surgery without obtaining another set of measurements of Dr. Smethers' eyes. Dr. Masket supported his opinions in this regard by reference to medical texts and literature, and by reference to FDA guidelines, all of which recommended having the contact lenses out of the patient's eyes for an extended period of time before any measurements forming the basis for subsequent corrective surgery were obtained.

¶ 25 As expected, Dr. Binder testified that, in his opinion, Dr. Campion's judgment to proceed without obtaining comparative measurements on the day of surgery was acceptable and within the standard of care.[6]

On direct examination, Dr. Binder testified:

> Q. Now based upon the 9 years of refractive history, based upon the examinations on October the 1st of 1999, based upon the [corneal] topography that we've just seen, and based upon Dr. Campion's medical judgment, Dr. Binder, do you have an opinion, to a reasonable degree of medical probability, whether Dr. Campion met the required standard of care in performing LASIK surgery on Dr. Smethers?
>
> A. He did.
>
> Q. Do you have an opinion on whether the standard of care required Dr. Campion to perform another—yet another set of measurements on the day of surgery, given all of the information that he had available to him?
>
> A. Since stability was clearly demonstrated, I think he acted appropriately, within the standard of care; and *I would have done the same thing with this type of information.*

(Emphasis added.)

¶ 26 Prior to cross-examination, Dr. Smethers' counsel argued that the "door had been opened," and that, as a matter of fairness, the issue of what this doctor would have done for this patient should be shared with the jury:

> MR. MILLEA: When the witness was asked the standard of care opinion, what I heard him say is he would have done exactly the same thing with this information. I think that opens the door to the question of what he would have done with this patient. I think it's inconsistent, by the way, with what he said [during witness *voir dire*] while the Jury was out. But leaving that aside, what he said was is

---

6. In a brief *voir dire* examination prior to direct examination, and outside the presence of the jury, Dr. Binder testified as follows:

> Q. Yes. Mr. Ryan [defense counsel] asked you [in your deposition] the following questions and you gave the following answers: "Now your opinions relating to the standard of care would not change with respect to that definition as—well, you testified what you would, is that correct?" And you said: "I think most prudent opthalmologists could tend to do what I do."
>
> Q. And in the context you're now referring to is the contact lens issue?
>
> A. Yes.
>
> Q. Is that the basis for your opinion, that you would expect most prudent ophthalmologists to do, what you do?
>
> A. Yes.
>
> Q. But in fact if you had been Dr. Campion in your office, even with his—what you believe was his stable refractions previously—Dr. Smethers in your office as a patient, he came in with his contact lenses in, he had a prior history of refractions that you believe indicated stability, you still would have remeasured him prior to surgery; correct?
>
> A. That's just my habit.
>
> Q. And your habits are the ones that you believe are what a prudent ophthalmologist should observe?
>
> A. As stated in the context of my deposition.
>
> Q. Do you know what the standard of care is in Arizona, Doctor?
>
> A. No.

[sic], "I would have done the same thing with this patient with the same information."

MR. RYAN: Your honor, that had nothing to do with the contact lens information at all; it had to do with the settings that were used in the LASIK.

THE COURT: I think you took it, Mr. Millea, at least what I heard—and maybe you can go back to the record—I think the context was a little bit different. So I'm going to find the door was not opened, and I will rule that that issue is sustained.

¶ 27 Although cross-examination was not allowed on Dr. Binder's "personal practice," which he deemed to be that of a "prudent opthalmologist," he was questioned vigorously on the standard of care, and ultimately conceded that certain text and literature sources, as well as federal government guidelines, all recommended waiting an extended period of time after the contact lenses were removed before the definitive measurements for surgery were obtained. Dr. Binder further conceded that he urges a similar precaution on his medical students/resident physicians before performing corrective eye surgery. However, he continued to insist that, in this situation, Dr. Campion was not required by the standard of care to take such precaution.

¶ 28 It is not necessary to this case that we conclusively pronounce on the broad issue whether, in all medical malpractice cases, an expert's own medical practices are *per se*

relevant and automatically admissible at trial. There are, admittedly, reported cases in Arizona that are somewhat contradictory whether a physician's "personal practice" is relevant to defining the standard of care. Although most of these cases refer to the idea that the standard of care is what is recognized as acceptable in the community of physicians involved in such practice, the cases vary on whether and under what circumstances one physician's personal approach to a medical problem is sufficient to establish the standard of care.[7]

¶ 29 There is authority for the proposition that an expert's approach to the management of a medical problem—even though the expert testifies that his method exceeds the standard of care—is relevant and admissible for the purpose of allowing the jury to determine what the standard of care calls for in such circumstance:

> As a general rule, the liability test to be employed by the court and the jury is the "standard of care" that a reasonably prudent physician would exercise under the same or similar circumstances as the defendant. Therefore, the ultimate test is not whether the expert would perform a medical act and/or teach a medical act in the same way or a different way as a particular defendant. *However, such a line of inquiry usually is admissible on the issue of credibility.* If, for example, the plaintiff's expert testifies that a defendant deviated from a certain standard of

---

7. *See, e.g., Vigil v. Herman,* 102 Ariz. 31, 34, 424 P.2d 159, 162 (1967) (stating that, in a medical malpractice case, the standard of care may be established by the defendant doctor's own testimony); *Stallcup v. Coscarart,* 79 Ariz. 42, 49, 282 P.2d 791, 796 (1955) (same); *Potter v. Wisner,* 170 Ariz. 331, 339, 823 P.2d 1339, 1347 (App. 1991) (recognizing that a defendant physician's own practice was at least some evidence of the standard of care, and concluding that the case was properly submitted to the jury notwithstanding the plaintiff's failure to call an independent expert on the standard of care); *Peacock v. Samaritan Health Serv.,* 159 Ariz. 123, 127, 765 P.2d 525, 529 (App.1988) (stating that the existence of a hospital protocol is some evidence of the standard of care applicable to the hospital, and "the trier of fact could conclude that the protocol was the standard of care and that the failure to follow that standard was negligence"); *Bell v. Maricopa Med. Ctr.,* 157 Ariz. 192, 195,

755 P.2d 1180, 1183 (App.1988) (concluding that the trial court properly rejected a proposed jury instruction that a violation of a hospital's protocol was evidence of negligence on the part of the hospital); *Evans v. Bernhard,* 23 Ariz.App. 413, 416, 533 P.2d 721, 724 (1975) ("The personal and individualistic method of practice of [the defendant physician] is not sufficient to establish a reasonable basis for any inference that he has departed from the general medical custom and practice in the community, nor can it support a conclusion that he was negligent in any regard by not following his own usual procedure."); *Harris v. Campbell,* 2 Ariz.App. 351, 355, 409 P.2d 67, 71 (1965) (concluding that testimony that one surgeon might choose a particular course did not constitute proof of the standard of care, which instead "must be based on the care and skill which is exercised generally by physicians of ordinary care and skill in the community involved or similar communities").

care, said expert's credibility certainly would be severely shaken if, in fact, it can be shown that this expert has performed a medical act in the same or similar manner as the defendant. *If a defense expert has testified that a defendant's medical act conformed with a certain acceptable standard of care, the credibility of said testimony certainly would be severely shaken, if said expert conceded on cross-examination that he personally does not perform and/or teach the medical act in the same manner.*

2 Steven E. Pegalis & Harvey F. Wachsman, American Law of Medical Malpractice § 14:7(e), at 492 (2d ed.1993)(emphasis added).

¶ 30 A similar argument was adopted by the Colorado Court of Appeals in *Wallbank v. Rothenberg,* 74 P.3d 413 (Colo.Ct.App. 2003). In that case, a physician was sued for failing to have obtained certain radiology studies before performing head and neck surgery. *Id.* at 415. Before trial, the court denied a motion *in limine* seeking to exclude evidence of any expert's "personal practice." *Id.* at 416. At trial, one of the plaintiff's experts testified that the standard of care required the radiology studies before performing surgery. *Id.* Another plaintiff's expert testified that, although the standard of care would not necessarily have required obtaining such pre-operative tests, she herself would have done so. *Id.* The defense expert testified that, although he personally would have obtained the radiology tests prior to surgery, the standard of care did not require such action. The jury returned a substantial verdict in favor of the plaintiff, and the defendant doctor appealed. *Id.* at 415.

¶ 31 In addressing the relevance of the experts' "personal practices" to the standard of care, the appellate court observed:

> While [*State Bd. of Med. Exam'rs v.*] *McCroskey* [880 P.2d 1188 (Colo.1994)] and [*Denver & Rio Grande R.R. v.*] *Vitello* [81 P. 766 (Colo.1905)] make it clear that a standard of care may not be established by the testimony of the personal practices of expert witnesses, those cases do not address whether this testimony may be relevant when other evidence is presented con-

cerning the applicable standard of care. This question is a matter of first impression for Colorado appellate courts.

We conclude, as did the trial court, that testimony concerning the experts' personal practices was of some relevance because each expert also testified concerning the applicable standard of care. We reach this conclusion for the following reasons.

First, as the *McCroskey* court noted, "the actual practice in a community" is the starting point in determining a reasonable standard of care. Thus, once the expert testifies concerning the standard of care, then testimony of that expert's personal practices may help the jurors understand why that standard of care is followed by that expert or other experts.

Second, testimony regarding an expert's personal practices may either bolster or impeach the credibility of that expert's testimony concerning the standard of care. Here, the Wallbanks' expert who stated that the standard of care did not require obtaining a CT scan or MRI nevertheless stressed the importance of obtaining those tests when questioned about why she did so on a regular basis. Under CRE [Colorado Rule of Evidence] 607, the Wallbanks could impeach their own expert. Similarly, the Wallbanks properly cross-examined Rothenberg's expert concerning his personal practice to obtain tests, when he testified that the standard of care did not require obtaining a CT scan or MRI. *See* C. Frederick Overby, *Trial Practice and Procedure,* 51 Mercer L.Rev. 487, 501–02 (1999)("The relevance and importance of a medical expert's personal choice of a course of treatment is highly probative of the credibility of the expert's opinion concerning the standard of care. A jury is free to disregard the expert's opinion entirely and find that the standard of care is reflected by the course of treatment the expert would have chosen, a highly probable scenario if other evidence admitted in the case supports this proposition.").

Third, because each expert addressed the applicable standard of care, testimony regarding their personal practices was proper direct and cross-examination.

Thus, the jury could give whatever weight it determined was appropriate to the testimony of those experts, including ignoring it completely.

*Id.* at 416–17.

■ ¶ 32 We agree that how a testifying expert approaches a medical problem may be relevant and of assistance to the jury in determining what the standard of care requires in a similar circumstance. More importantly, the jury is entitled to fully evaluate the credibility of the testifying expert, and the fact that an expert testifies that the standard of care does not require what that expert personally does in a similar situation may be a critical piece of information for the jury's consideration. This is particularly true when, as here, there was other evidence in the record—in the form of Dr. Masket's testimony and the medical literature—that supported the position that Dr. Binder's "personal practice" was perhaps closer to reflecting the applicable standard of care than that espoused by Dr. Binder in his official standard of care opinion.[8]

¶ 33 Finally, based upon our review of the trial transcript, it appears that Dr. Binder may have contradicted himself when he testified that he would have "done the same thing" as Dr. Campion in choosing not to remeasure the corneas of this patient before performing the surgery. Counsel for Dr. Smethers should have been allowed to impeach Dr. Binder with his deposition testimony that he personally would have waited a longer period of time after the lenses were removed before taking the measurements upon which the surgical corrections would be based or would have repeated the measurements prior to surgery.

¶ 34 Accordingly, we hold that it was error to limit the cross-examination of Dr. Binder as it relates to his personal approach to this medical issue. Because we cannot predict how a jury would have reacted to this information, we cannot say that this was merely harmless error. Therefore, we reverse the verdict entered and remand for a new trial.

CONCURRING: SUSAN A. EHRLICH, Presiding Judge and GEORGE H. FOSTER, Judge Pro Tempore *.

---

**8.** If this case is retried, the trial court may appropriately choose to give a limiting instruction similar to that previously proposed by Dr. Smethers. *See supra* ¶ 23.

\* NOTE: The Honorable GEORGE H. FOSTER, a Judge of Maricopa County Superior Court, was authorized by the Chief Justice of the Arizona Supreme Court to participate in the disposition of this appeal pursuant to the Arizona Constitution, Article 6, Section 3, and A.R.S. §§ 12–145 to –147 (2003).