SIXTH DIVISION
October 13, 2006

No. 1-05-2710

| | | |
|---|---|---|
| MARY ELLEN SCHMITZ and AMBROSE JOSEPH SCHMITZ, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants, | ) ) | Cook County, Illinois. |
| v. | ) ) | No. 98 L 11690 |
| STEVEN BINETTE, | ) ) ) | Honorable |
| Defendant-Appellee | ) ) | Thomas Hogan |
| (DR. PAUL K. ROSENBERG, LTD., a Corporation, d/b/a Female Healthcare Associates, Ltd., and DANIEL GARVEY, | ) ) ) ) ) ) | Judge Presiding. |
| Defendants). | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiffs, Mary Ellen Schmitz and Ambrose Joseph Schmitz, brought suit against

defendants, Steven Binette, M.D., Dr. Paul K. Rosenberg, Ltd., and Daniel Garvey,

M.D., alleging damages for negligence stemming from a "bladder suspension

procedure" performed by Dr. Binette on Mary. Ambrose also brought claims for "family

expenses" pursuant to the Rights of Married Persons Act (750 ILCS 65/15 (West 2002))

and for loss of consortium. Mary died prior to trial and Ambrose was appointed special

administrator of Mary's estate. Plaintiff dismissed the claims against defendants Dr.

Paul K. Rosenberg, Ltd., and Daniel Garvey, M.D., prior to trial, leaving Dr. Binette as

the only defendant. A jury found for defendant, and plaintiff appeals arguing that the

trial court erred in denying his motion *in limine* and his motion for a new trial, in which he argued that he should have been allowed to cross-examine defendant's expert witness regarding his personal practices as a gynecologist. For the following reasons, we reverse and remand.

I.      BACKGROUND

Plaintiff's second amended complaint alleged the following. Sometime prior to January 2, 1997, Mary sought treatment from Dr. Binette for pelvic pain and "genuine stress urinary incontinence," a urological condition characterized by an inability to retain urine. Dr. Binette recommended surgery to relieve Mary's ailments, including "procedures known as exploratory laparotomy with lysis of adhesions, a bilateral salpingo-oopherectomy, and a Marshall-Marchetti-Krantz (MMK) procedure, in which the bladder is surgically restored to its normal physiological position." On January 2, 1997, Dr. Binette performed these procedures, during which time a suture was placed on Mary's right ureter.

The complaint further alleged that Dr. Binette was negligent (1) in causing an obstruction in Mary's right ureter with a suture, (2) in failing to adequately monitor Mary in the peri-operative period to ascertain the presence of any damage or obstruction to her right ureter, (3) in failing to adequately monitor Mary in the postoperative period to ascertain the presence of any damage or obstruction to her right ureter, and (4) in failing to exercise the appropriate degree of skill and care in treating Mary. As a result of this negligence, the complaint alleged (1) that Mary developed hydro-uretal nephrosis of the right kidney, (2) that multiple subsequent procedures were required, (3) that her

kidney became infected and lost all function, and (4) that the kidney ultimately had to be removed. The complaint also alleged a count of negligence based on *res ipsa loquitur*, and two counts raised by Ambrose based on family expenses and loss of consortium. In his answer, Dr. Binette generally denied any negligence.

The case proceeded to trial on July 19, 2005. Plaintiff called Dr. Samir Hajj, an obstetrician/gynecologist, as an expert witness. Dr. Hajj stated that after review of the medical records, depositions, and other related documents pertaining to the care of Mary, including the medical records of Drs. Binette and Garvey, it was his opinion that Dr. Binette deviated from the applicable standard of care by not checking "the integrity of the ureter [on] which he was operating." Dr. Hajj explained that in a bladder operation, because the area is so small, "if you place a suture in the wrong position inadvertently, it can cause damage of kinking or obstruction to the ureter." He further explained that it is important to check the integrity of the ureter, particularly with patients like Mary, who have had previous bladder surgeries. (Mary had a different bladder surgery in 1993.)

Dr. Hajj next explained that the MMK procedure involves putting sutures on both sides of the "bladder neck," which is the junction of the urethra and the bladder, and "lifting things up and attach[ing] it to the bone ahead of the bladder." He then stated that a surgeon can do one of two things to check that the ureter is functioning after such a procedure. He stated that the first method was developed at the Mayo Clinic and involves opening the bladder and placing sutures diagonally on the bladder incision. The second method, known as a cystoscope examination, involves putting an

instrument with a light into the ureter and then introducing an "indigo carmine dye." Dr. Hajj explained that "the dye has to come down via the ureter into the bladder, so, if there is no flow of urine, then you have to assume there is an obstruction there and you have to investigate." He further stated that any gynecologist "operating in the female urinary tract" should be familiar with these tests. Dr. Hajj next opined that Dr. Binette caused an obstruction when he placed a suture on Mary's ureter. He further stated that Dr. Binette's failure to perform the indigo carmine dye test caused Mary to ultimately lose her kidney.

On cross-examination, Dr. Hajj again stated that the standard of care applicable to gynecologists requires that a cytoscope/indigo carmine dye test be performed after a MMK procedure. Dr. Hajj then acknowledged that an article written by Dr. Peter Sand stated that most gynecologists do not actually perform the test; however, Dr. Hajj stated that he disagreed with Dr. Sand on this point. Dr. Hajj also acknowledged that Dr. Garvey, one of Mary's treating physicians, stated in his deposition that it is usually unnecessary to do a cystoscopic examination after an MMK procedure.

Defendant called Lane Mercer, M.D., a gynecologist with a specialty in gynecological urology, as an expert witness. Dr. Mercer stated that after reviewing the relevant medical records and depositions, it was his opinion that the surgery Dr. Binette performed on Mary was within the standard of care. Dr. Mercer further stated that, in his opinion, the obstruction in Mary's ureter did not occur where Dr. Binette placed sutures. Dr. Mercer explained that the first signs of an obstruction occurred about 12 days after the surgery when Mary reported flank pain. He further stated that he thought

4

the obstruction was caused because the ureter was kinked or bent, but that the kink was not caused by a suture.

Dr. Mercer further stated that the MMK procedure is one of over 200 types of bladder suspension surgeries, and that one of its advantages is that it is less likely than many of the other procedures to involve the ureters or cause kinking. Dr. Mercer stated that, contrary to Dr. Hajj's opinion, the standard of care does not require gynecologists to perform a cystoscopy and use indigo carmine dye after an MMK procedure. Dr. Mercer explained that a cystoscopy is an invasive procedure, that it requires several steps, that it can take as long as 40 minutes, and that the patient's incisions from the initial procedure are left open the entire time. He stated that these steps increase the patient's risk for infection and that there is a risk of lacerating the top of the urethra with the scope. Dr. Mercer further explained that a cystoscopy and indigo carmine dye test will fail to identify an obstruction in 30% to 50% of cases because the kinking or bending actually occurs sometime later as a delayed consequence of the surgery. Finally, Dr. Mercer stated that although not common, some people can have an allergic reaction to the indigo dye used.

On cross-examination, Dr. Mercer stated that causing an obstruction in the ureter through lifting it is a known risk of the surgery. He further stated that the cystoscopy and indigo carmine dye test is 50 % accurate in determining whether the ureter is still functioning after a bladder surgery.

Prior to Dr. Mercer's testimony, plaintiff brought a motion *in limine* in which he argued to be allowed to question Dr. Mercer about his routine performance of the

indigo carmine dye test after MMK procedures to contradict any assertion made by Dr. Mercer at trial that performance of the test is not mandated by the standard of care. Plaintiff contended that Dr. Mercer testified in his deposition to routinely performing the indigo carmine dye tests after bladder suspension surgeries. Plaintiff also contended that his right to question Dr. Mercer on his personal medical practices was supported by the Fourth District case, Gallina v. Watson, 354 Ill. App. 3d 515, 821 N.E.2d 326 (2004). At oral arguments on the motion, plaintiff stated that Dr. Mercer testified at his deposition that "he does [a cystoscopy and indigo carmine dye test] each and every time he does an MMK or a bladder suspension case, each and every time." Plaintiff then clarified that he did not intend to question Dr. Mercer about the use of the indigo carmine dye test to establish that the standard of care actually required the test; rather, plaintiff contended that his own expert, Dr. Hajj, could establish that point. Instead, plaintiff argued that he should be able to question Dr. Mercer on his personal practices simply to challenge his credibility and diminish the weight the jury would give his testimony. The court denied the motion, stating that Dr. Mercer's personal practices were irrelevant to the standard of care. The court elaborated by saying:

"[I]f [Dr. Mercer] says that the standard of care is x, and he does more than the standard of care, why is that relevant? *** If he does less I would agree with you [plaintiff's counsel]. If an expert were put on and that expert says the standard of care is x and I do x minus, I think that's relevant because that calls into question the expert's understanding of what it is to conform to the standard of care. It also calls into question the

6

sensibility of the lawyer who put that expert on the stand."

After the jury returned a verdict in favor of defendant, plaintiff brought a motion for a new trial in which he made the same argument, and the trial court similarly denied the motion.

The relevant portion of Dr. Mercer's deposition testimony is as follows:

"PLAINTIFF'S COUNSEL: Is it the standard of care presently when you do a bladder suspension case to do a cystoscopic examination of the ureters by the introduction of indigo carmine dye?

Dr. MERCER: No.

***

PLAINTIFF'S COUNSEL: Okay, Dr. Mercer, how many cystoscopies have you done in your career?

Dr. MERCER: Are you talking about routinely or after surgeries?

PLAINTIFF'S COUNSEL: Intraoperatively during a bladder suspension.

Dr. MERCER: I do them quite readily, quite commonly.

PLAINTIFF'S COUNSEL: And do you also do the indigo carmine dye quite readily or quite commonly?

Dr. MERCER: Yes.

PLAINTIFF'S COUNSEL: And you do that in order to check the ureters, right?

Dr. MERCER: I do it because I'm a compulsive SOB who has been in depositions for too long and too afraid not to. The answer to your question is I do it to check the ureters, yes.

PLAINTIFF'S COUNSEL: It would be fair to say that a reasonably well-qualified gynecologist or urologist to the Chicago metropolitan area would routinely do a cystoscopic examination with the introduction of indigo carmine dye when he does a bladder suspension case?

Dr. MERCER: No.

PLAINTIFF'S COUNSEL: What percentage, in your opinion, does not?

Dr. MERCER: Okay, I can't even address that. I hold myself out as a urogynecologist, so therefore I have a different standard of care that I have to meet in my practice, in my specialty.

PLAINTIFF'S COUNSEL: So what you're saying, it's the standard of care for yourself but you don't believe there's a standard of care for the industry?

Dr. MERCER: I'm saying it's a standard of care for urogynecologists, particularly those who do second or third procedures. It is not the standard of care for a gynecologist."

On appeal, the central issue is whether the plaintiff should have been able to

question defendant's expert at trial about his personal practice of utilizing the indigo carmine dye test[1] after MMK procedures. In support of his position that questioning an expert about his personal practices is proper for credibility purposes, plaintiff relies heavily on the Fourth District case, Gallina, 354 Ill. App. 3d 515, 821 N.E.2d 326. Plaintiff also cites to cases from other states for the same purpose. Defendant first contends that the trial court acted within its discretion in denying plaintiff's motions because plaintiff made an incomplete and inaccurate offer of proof as to what Dr. Mercer stated in his deposition. Defendant further contends that the only instance where an expert can be questioned regarding his personal practices is where those practices are *always* different from the practices endorsed at trial as constituting the standard of care.

## II.  ANALYSIS

We review a trial court's rulings on motions *in limine* and motions for a new trial for abuse of discretion. See Popko v. Continental Casualty Co., 355 Ill. App. 3d 257, 266, 823 N.E.2d 184, 192 (2005); Obszanski v. Foster Wheeler Construction Inc., 328 Ill. App. 3d 550, 554, 765 N.E.2d 1193, 1196-97 (2002). Similarly, the scope of cross-examination of a witness is

---

[1] As indicated by the experts' testimony in this case, as well as by the parties' use of the terms, the "indigo carmine dye test" goes hand in hand with a "cystoscopy." Although it is not clear whether one procedure is part of the other, or whether they are just normally conducted in conjunction, for purposes of clarity and brevity, we will henceforth group both procedures within the term "indigo carmine dye test."

9

within the sound discretion of the trial court. Mielke v. Condell Memorial Hospital, 124 Ill. App. 3d 42, 46, 463 N.E.2d 216, 220 (1984). A trial court abuses its discretion only if it "act[s] arbitrarily without the employment of conscientious judgment, exceed[s] the bounds of reason and ignore[s] recognized principles of law [citation] or if no reasonable person would take the position adopted by the court." Popko, 355 Ill. App. 3d at 266, 823 N.E.2d at 192.

Generally, in medical negligence cases,

"the plaintiff, by use of expert testimony, must establish the standards of care against which the defendant doctor's conduct is to be measured. The plaintiff must then further prove by affirmative evidence that, judged in light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff." Borowski v. Von Solbrig, 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05 (1975).

Although the plaintiff has not included jury instructions with the record on appeal, the applicable pattern instruction states that a doctor "must possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified [doctor] practicing in the same or similar localities under the circumstances similar to those shown by the evidence. A failure to do so is professional negligence." Illinois Pattern Jury Instructions, Civil, No. 105.01 (2005); see also Bryant v. LaGrange Memorial Hospital, 345 Ill. App. 3d 565, 575, 803 N.E.2d 76, 84 (2003) ("the standard of care required of a defendant medical professional is to act as would an 'ordinarily careful professional.' [Citation.] Under this standard of care, a professional is expected

to use the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise in similar circumstances").

We first address Dr. Binette's contention that plaintiff failed to make a sufficient offer of proof that Dr. Mercer testified in his deposition to routinely performing the indigo carmine dye test after bladder suspension procedures. Dr. Binette notes that plaintiff's written motion failed to cite specific language from Dr. Mercer's deposition, and then contends that at oral argument on his motion, plaintiff inaccurately paraphrased Dr. Mercer's testimony. Specifically, Dr. Binette notes that plaintiff inaccurately stated that Dr. Mercer said he performs the indigo carmine dye test "each and every time" he performs MMK procedures, when, in fact, Dr. Mercer testified that he performs the test "quite readily, quite commonly." Dr. Binette further contends that plaintiff mischaracterized Dr. Mercer's testimony by excluding his explanation for why the standard of care is more stringent for him as a gynecologist with a subspecialty in gynecological urology (urogynecology) than it was for Dr. Binette, as a gynecologist with no such subspecialty.

Generally, "where a party fails to make an offer of proof as to excluded testimony, that party waives any claim that the testimony was improperly excluded." Carter v. Azaran, 332 Ill. App. 3d 948, 956, 774 N.E.2d 400, 408 (2002). However:

"It is not necessary that an offer of proof be made where the question shows the

purpose and materiality of the evidence. It is not necessary that counsel state

what the answer would be. If a question is in proper form and clearly admits of

an answer relative to the issues, the party by whom the question is propounded is

11

not bound to state facts proposed to be proved by the answer unless the court

requires him to do so." Creighton v. Elgin, 387 Ill. 592, 606, 56 N.E.2d 825, 831

(1944).

Moreover:

"[A]n offer of proof is not required if it is apparent that the trial judge understood

the nature of the objection and the character of the evidence sought to be

introduced or if the questions themselves and circumstances surrounding them

show the purpose and materiality of the evidence." Carter, 332 Ill. App. 3d at

956, 774 N.E.2d at 408, citing Bafia v. City International Trucks, Inc., 258 Ill.

App. 3d 4, 7-8, 629 N.E.2d 666 (1994).

We do not agree with defendant that plaintiff has waived his right to bring this appeal

through any defect in his offer of proof regarding Dr. Mercer's deposition testimony. Despite

plaintiff's imprecise quote during oral arguments of Dr. Mercer's deposition testimony, his

written motion stated that Dr. Mercer "routinely performs" the indigo carmine dye test after

bladder suspension procedures. This statement in the motion *in limine* is in substantial

conformance with Dr. Mercer's actual deposition testimony where he stated he performs the test

"quite readily, quite commonly." Moreover, it is clear from the trial court's thoughtful

discussion of the issue during oral arguments that it understood plaintiff's contentions as to the

significance of Dr. Mercer's deposition testimony. See Carter, 332 Ill. App. 3d at 956, 774

N.E.2d at 408. Therefore, we find that plaintiff has not waived his right to bring this appeal.

Plaintiff first and primarily contends that the trial court abused its discretion by ignoring

the precedent set in Gallina that an expert's personal practices may be relevant to the persuasive value of his opinions and his credibility. In Gallina, plaintiff was in an automobile accident and sustained fractures to his jaw, left femur, pelvis, hand, and both ankles and also ruptured his spleen and suffered a loss of blood. Gallina, 354 Ill. App. 3d at 516-17, 821 N.E.2d at 327. Plaintiff was brought to a hospital where he was treated by defendant doctor, who testified that plaintiff's right ankle had a "type II" fracture. Gallina, 354 Ill. App. 3d at 517, 821 N.E.2d at 328. The defendant doctor also testified that he did not operate on the right ankle because plaintiff had already undergone other surgeries and an additional surgery could be life-threatening. Gallina, 354 Ill. App. 3d at 517, 821 N.E.2d at 328. Plaintiff thereafter filed suit against the defendant doctor alleging that he was negligent in failing to operate on a "type II" fracture. Gallina, 354 Ill. App. 3d at 517, 821 N.E.2d at 328. Prior to trial, the defendant doctor filed a motion *in limine* seeking to exclude a portion of his expert's video testimony regarding the expert's personal preference for operating on all "type II" fractures. Gallina, 354 Ill. App. 3d at 517, 821 N.E.2d at 328. The trial court granted the motion and the jury subsequently found for defendant. Gallina, 354 Ill. App. 3d at 517-18, 821 N.E.2d at 328. After distinguishing the supreme court case of Walski v. Tiesenga, 72 Ill. 2d 249, 381 N.E.2d 279 (1978), and the appellate court cases of Stevenson v. Nauton, 71 Ill. App. 3d 831, 390 N.E.2d 53 (1979), and Mazzone v. Holmes, 197 Ill. App. 3d 886, 557 N.E.2d 186 (1990), from the facts of its case, the Fourth District found that the trial court abused its discretion in excluding the expert's testimony regarding his personal practice because that testimony was relevant and it affected the expert's credibility and persuasiveness. Gallina, 354 Ill. App. 3d at

519-522, 821 N.E.2d at 330-31.

As discussed by the court in Gallina, we note that our supreme court in Walski stated:

"It is insufficient for plaintiff to establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care. (See Ybarra v. Cross (1974), 22 Ill. App. 3d 638, 644; [citation].) As the Supreme Court of Washington noted in a similar case:

'[A] jury is no more capable of choosing between conflicting standards in this highly technical area than it is in creating a standard for itself. For this very reason it has always been the rule that:

The testimony of other physicians that they would have followed a different course of treatment than that followed by the defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. In such cases, the court must hold that there is nothing upon which the jury may pass, the reason being that the jury may not be allowed to accept one theory to the exclusion of the other. [Citations.]' Versteeg v. Mowery (1967), 72 Wash. 2d 754, 758-59." Walski, 72 Ill. 2d at 261-62, 381 N.E.2d at 285.

14

In Gallina, the court noted that its plaintiff did not attempt to establish a *prima facie* case with the testimony of defendant's expert as to how he personally would have acted but, rather, established the standard of care through his own expert. Gallina, 354 Ill. App. 3d at 519, 821 N.E.2d at 329. Thus, the Gallina court concluded that Walski did not stand for the proposition that an expert's personal practices are never relevant, but merely that a plaintiff cannot establish the applicable standard of care (an essential element of a medical negligence cause of action) through a defense expert's personal practices. Gallina, 354 Ill. App. 3d at 519, 821 N.E.2d at 329.

The Gallina court similarly distinguished its facts from those in Stevenson. In Stevenson, the plaintiff brought suit against her former doctor alleging negligence in failing to diagnose and treat a suspected case of temporal arteritis. Stevenson, 71 Ill. App. 3d at 832, 390 N.E.2d at 54. The plaintiff indicated her intention to call only one expert at trial, Dr. Atchoo, who testified in his deposition that he had no opinion as to whether the defendant's treatment of plaintiff was below acceptable medical standards. Stevenson, 71 Ill. App. 3d at 834, 390 N.E.2d at 54. The trial court granted summary judgment in favor of the defendant on the basis of this testimony. Stevenson, 71 Ill. App. 3d at 833, 390 N.E.2d at 54. The appellate court affirmed noting that in medical malpractice cases, plaintiffs must prove the applicable standard by which the defendants' conduct is to be measured. Stevenson, 71 Ill. App. 3d at 834, 390 N.E.2d at 55, citing Walski, 72 Ill. 2d at 255, 381 N.E.2d at 282. The court also stated:

> "The expert's statements as to what he would have done in the situation
> encountered by [defendant] are irrelevant since the issue before the trial court was

15

whether the defendant acted contrary to accepted or customary medical standards at that time and place. [Citations.]" Stevenson, 71 Ill. App. 3d at 835, 390 N.E.2d at 56.

In citing this language from Stevenson, the Gallina court conceded that, when read alone, the statement could appear to support the position that an expert's personal practices are *never* relevant. Gallina, 354 Ill. App. 3d at 519, 821 N.E.2d at 329. However, the Gallina court then noted that when read in the context of the case, where the plaintiff offered no evidence as to the standard of care, the Stevenson court was merely stating the rule that a "plaintiff's expert's statements about what he would have done [are] not relevant in establishing plaintiff's *prima facie* case." Gallina, 354 Ill. App. 3d at 520, 821 N.E.2d at 329.

Finally, the Gallina court disagreed with the apparent extent of the holding in Mazzone. Gallina, 354 Ill. App. 3d at 520, 821 N.E.2d at 330. In Mazzone, the plaintiff was injured when the defendant doctor broke a surgical pin while attempting to remove it. Mazzone, 197 Ill. App. 3d at 889, 557 N.E.2d at 187. Defendant's expert testified that the fact that the pin broke during removal did not indicate a deviation from the standard of care. Mazzone, 197 Ill. App. 3d at 893, 557 N.E.2d at 190. The trial court prohibited plaintiff from questioning the expert about his deposition testimony, where the expert stated that he had personally stopped using the pins because they were known to break and that the " 'orthopedic community' in general 'knew there was an incidence of failure of any type of metallic device placed across the acromioclavicular joint for stabilization.' " Mazzone, 197 Ill. App. 3d at 898, 557 N.E.2d at 193. On appeal, plaintiff argued that this testimony was relevant to the standard of care, but the appellate court

16

disagreed, stating: "on the issue of whether the defendant deviated from the standard of care, an expert's statements as to what he would have done are not relevant because differences in opinion are consistent with conformity to the applicable standard." Mazzone, 197 Ill. App. 3d at 898, 557 N.E.2d at 193, citing Walski, 72 Ill. 2d at 261, 381 N.E.2d at 285; Stevenson, 71 Ill. App. 3d at 835, 390 N.E.2d at 56. The court further noted that the issue involved whether the defendant breached the standard of care in removing the pin, not whether it was a breach to use the pin in the first place. Mazzone, 197 Ill. App. 3d at 898, 557 N.E.2d at 193. The court in Gallina disagreed with the holding in Mazzone to the extent that its declaration that "an expert's statements as to what he would have done are not relevant" (Mazzone, 197 Ill. App. 3d at 898, 557 N.E.2d at 193) amounted to statement that such statements are *never* relevant. Gallina, 354 Ill. App. 3d at 520, 821 N.E.2d at 330.

The Gallina court then cited to Rush v. Hamdy, 255 Ill. App. 3d 352, 627 N.E.2d 1119 (1993), for support of its holding that an expert's personal practices may be relevant to the expert's credibility and the persuasive value of his opinions. Gallina, 354 Ill. App. 3d at 520, 821 N.E.2d at 330. In Rush, plaintiff brought suit against defendant doctor for injuries sustained during an esophageal dilatation. Rush, 255 Ill. App. 3d at 354, 627 N.E.2d at 1121. Defendant's expert testified that the defendant's use of an "achalasia balloon" during the procedure was not a breach of the standard of care. Rush, 255 Ill. App. 3d at 358, 627 N.E.2d at 1123. The trial court prohibited plaintiff from questioning defendant's expert regarding statements made in his deposition that he would have used a "savary dilator" instead of an "achalasia balloon." On appeal, as summarized by the appellate court, plaintiff argued:

17

> "[T]here is a difference in the persuasive value of an expert witness who testifies a certain procedure is within the standard of care and is the procedure which the expert himself would have used under the same circumstances and an expert who testifies a certain procedure is within the standard of care, but that he would not have utilized that procedure under the same circumstances." Rush, 255 Ill. App. 3d at 362, 627 N.E.2d at 1126.

The appellate court agreed with this argument; however, it nevertheless found that the trial court did not abuse its discretion in prohibiting plaintiff from cross-examining the expert about what he would have done personally, because plaintiff was allowed to establish that the expert never utilized the "achalasia balloon" for such a procedure and never heard of any other doctor ever using the device in that context. Rush, 255 Ill. App. 3d at 362-63, 627 N.E.2d at 1126.

Defendant attempts to distinguish Gallina from the instant case by pointing out that the defendant's expert there stated that he *always* acted in a manner different from what he opined to be the standard of care, while here, Dr. Mercer merely stated that although he regularly performs the indigo carmine dye tests, Dr. Binette acted in compliance with the standard of care despite the fact that he did not conduct the test. Specifically, the expert in Gallina testified in his deposition: "I tend to be one that fixes them [through surgery] *** *All Type IIs*, Type Is I may treat nonoperatively." (Emphasis added.) Gallina, 354 Ill. App. 3d at 517-18, 821 N.E.2d at 328. Although this distinction could potentially be a significant one in another case, we do not agree that the distinction truly exists here. Although Dr. Mercer's statement that he performed the indigo carmine dye test after bladder suspension procedures "quite readily, quite commonly,"

does not, in itself, indicate that he *always* performed the test, other statements in his deposition suggest that he did, in fact, perform the test as a matter of course. For instance, he also stated that he performed the test because he "[had] been in depositions for too long and [was] too afraid not to." Dr. Mercer then explained that the standard of care was different for him as a urogynecologist than it was for gynecologists such as Dr. Binette, thus, in effect stating that performance of the indigo carmine dye test was a requirement of the standard of care applicable to him as a urogynecologist. Thus, we do not agree with defendant that the instant case is distinguishable from Gallina on this point.

However, we note an additional distinction raised by the trial court. In the instant case, Dr. Mercer testified that the standard of care consisted of performing the MMK procedure without any additional testing through the use of indigo carmine dye. However, he also testified in his deposition that he regularly performed the indigo carmine dye test after bladder suspension procedures such as the MMK. Thus, here, we have a case where the expert says the standard of care requires procedure A and only procedure A, but that he personally performs procedure A

and, for various reasons,[2] additionally performs test B. This is not a case where the expert says that procedure A complies with the standard of care, but I personally do procedure C instead, such as in Gallina where the expert said treating a Type II fracture without surgery was within the standard of care, but that he always performs surgery on such fractures. Gallina, 354 Ill. App. 3d at 517, 821 N.E.2d at 328. Similarly, in Rush, the expert testified that using an "achalasia balloon" (procedure A) was sufficient to meet the standard of care, but that he personally would use a "savary dilator" (procedure C). Rush, 255 Ill. App. 3d at 358, 627 N.E.2d at 1123. In this case, the trial court found that the fact that Dr. Mercer regularly

---

[2]As noted, in his deposition, Dr. Mercer discussed his reasons for performing the indigo carmine dye test as including that he had "been in depositions too long and [was] too afraid not too" and that he had a subspecialty in urogynecology. Had plaintiff been allowed to question Dr. Mercer about his personal practices, testimony regarding his subspecialty may have been rehabilitating; however, such potential rehabilitation would not necessarily have negated the relevance of his personal practice to his credibility.

exceeded the standard of care by doing an additional test (procedure A, plus test B) was irrelevant.

To a degree, we agree with the distinction raised by the trial court because testimony such as that given by Dr. Mercer is not necessarily inconsistent, in that an expert's personal preference for providing treatment beyond the standard the care may be explained as reflecting that particular expert's unique cautiousness or excellence, while an expert, like those in Gallina and Rush, who unvaryingly performs inconsistently with his testimonial opinion as to the standard of care is much less likely to be believed by a jury if those inconsistencies are brought to light during a cross-examination. Similarly, as noted by the trial court, the credibility of an expert who personally performs less than his estimation of the standard of care would also likely be compromised in the eyes of a jury. However, although an expert who personally exceeds the standard that he testifies to is not as readily impeached as an expert who provides wholly different treatment than that which he contends is adequate, we cannot deny that such a disparity would, nevertheless, be quite relevant to a jury that is charged with determining which of two highly qualified experts should be believed.

Moreover, the relevance of an expert's personal practice of exceeding his view of the standard of care is supported by the out-of-state cases cited by plaintiff. In Wallbank v. Rothenberg, 74 P.3d 413 (Colo. App. 2003), the parents of a child who sustained partial paralysis to the right side of her face as a result of a surgery to remove a growth on her neck brought a medical negligence action against the child's doctor. Wallbank, 74 P.3d at 415. A jury found in favor of plaintiffs, and defendant doctor appealed, arguing that both his and plaintiffs'

21

experts were improperly allowed to testify regarding their personal practices. Wallbank, 74 P.3d at 415. Specifically, defendant moved to bar the experts' testimony that they personally would have obtained a CT scan or an MRI prior to surgery even though those tests were not required by the standard of care. Wallbank, 74 P.3d at 416. (Thus, this case involves the situation where the expert does more than that which he says is required by the standard of care.) The Colorado appellate court held that, while testimony of the personal practices of experts cannot be used to establish the standard of care, such testimony may be otherwise relevant. Wallbank, 74 P.3d at 416. In support of this conclusion the court first noted that " ' the actual practice in a community' is the starting point in determining a reasonable standard of care." Wallbank, 74 P.3d at 416. Thus, the court reasoned, "once the expert testifies concerning the standard of care, then testimony of that expert's personal practices may help the jurors understand why that standard of care is followed by that expert or other experts." Wallbank, 74 P.3d at 416-17. Second, the court stated that "an expert's personal practices may either bolster or impeach the credibility of that expert's testimony." Wallbank, 74 P.3d at 417, citing C. Overby, J. Crawford, . Abell & M. Cook, Trial Practice and Procedure, 51 Mercer L. Rev. 487, 501-02 (1999) ("The relevance and importance of a medical expert's personal choice of a course of treatment is highly probative of the credibility of the expert's opinion concerning the standard of care. A jury is free to disregard the expert's opinion entirely and find that the standard of care is reflected by the course of treatment the expert would have chosen, a highly probable scenario if other evidence admitted in the case supports this proposition"). Finally, the court reasoned that "because each expert addressed the applicable standard of care, testimony regarding their personal practices was

proper direct and cross-examination." Wallbank, 74 P.3d at 417.  Accordingly, the court found that the trial court did not abuse its discretion in allowing the experts to testify to their personal practices.  Wallbank, 74 P.3d at 417.

Similarly, in Smethers v. Campion, 210 Ariz. 167, 108 P.3d 946 (Ariz. App. 2005), the plaintiff sued the defendant eye surgeon for complications that developed after a LASIK surgery.  Smethers, 210 Ariz. at 169, 108 P.3d at 948.  A jury returned a verdict in favor of the defendant and the plaintiff appealed, arguing that the trial court improperly limited him from questioning a defense expert.  Smethers, 210 Ariz. At 169, 108 P.3d at 948.  Specifically, the plaintiff argued that he should have been able to question the expert about his personal practice of obtaining new eye measurements immediately prior to LASIK surgery to impeach that expert's testimony that the standard of care did not require that new measurements be obtained.  Smethers, 210 Ariz. at 170, 108 P.3d at 949.  (Thus, here, like in the instant case and in Wallbank, the expert personally exceeded his opinion as to the standard of care.)  In holding that the trial court erred in limiting plaintiff's cross-examination of defendant's expert, the Arizona appellate court stated:

"[H]ow a testifying expert approaches a medical problem may be relevant and of assistance to the jury in determining what the standard of care requires in a similar circumstance.  More importantly, the jury is entitled to fully evaluate the credibility of the testifying expert, and the fact that an expert testifies that the standard of care does not require what that expert personally does in a similar situation may be a critical piece of information for the jury's consideration.  This is particularly true when, as here, there was other evidence in the record *** that

23

supported the position that [defendant's expert's] 'personal practice' was perhaps closer to reflecting the applicable standard of care than that espoused by [defendant's expert] in his official standard of care opinion." Smethers, 210 Ariz. at 177, 108 P.3d at 956.

We agree with Gallina, Rush, Walbank, and Smethers that an expert's personal practices may well be relevant to that expert's credibility, particularly when those practices do not entirely conform to the expert's opinion as to the standard of care. Moreover, as discussed by Gallina, we do not believe that holding as such conflicts with Walski, Stevenson, or Mazzone, as those cases merely stand for the rule that a plaintiff cannot establish the standard of care solely through an expert's testimony as to his personal practices. See Walski, 72 Ill. 2d at 261-62, 381 N.E.2d at 285; Stevenson, 71 Ill. App. 3d at 835, 390 N.E.2d at 56; Mazzone, 197 Ill. App. 3d at 898, 557 N.E.2d at 193. As noted, although Dr. Mercer's opinion at trial that the standard of care did not require Dr. Bennet to perform the indigo carmine dye test did not necessarily contradict his deposition testimony that he personally performed the test after such procedures "quite readily, quite commonly," the testimony was, nevertheless, inconsistent and may have provided some additional insight to the jury. The jury was entitled to hear this relevant testimony on cross-examination, and defendant would then have been free to attempt to rehabilitate Dr. Mercer's testimony on redirect.

Moreover, although Dr. Mercer's deposition testimony was not necessarily in contradiction to his personal practice of performing the indigo carmine dye test, his specific testimony at trial actually created a more specific contradiction. As noted, when questioned by

the defense about the indigo carmine dye test, Dr. Mercer explained several dangers of the test, including that it is an invasive procedure, that it increases the risk of infection, that there is a risk of lacerating the urethra, and that some patients may have allergic reactions to the dye. Dr. Mercer also stated that the test fails to identify an obstruction in 30% to 50% of cases. Thus, Dr. Mercer did not merely testify that the indigo carmine dye test was not required by the standard of care, he implied that the test was unreasonably dangerous and ineffective. This testimony would have been readily impeached had plaintiff been allowed to question Dr. Mercer about his personal practice of performing the indigo carmine dye test "quite regularly, quite commonly." Accordingly, we find that the trial court erred in barring plaintiff from questioning Dr. Mercer about his personal practices.

For the foregoing reasons, we reverse and remand for a new trial.

Reversed and remanded.

CAHILL, J. and ROBERT GORDON, J., concur.