# Illinois Official Reports

## Appellate Court

---

### *Swift v. Schleicher*, 2017 IL App (2d) 170218

---

| | |
|---|---|
| Appellate Court Caption | LISA SWIFT, Plaintiff-Appellant, v. DAVID J. SCHLEICHER, M.D.; SWEDISHAMERICAN HEALTH SYSTEM CORPORATION; SWEDISHAMERICAN MEDICAL GROUP; and SWEDISHAMERICAN HOSPITAL, Defendants (David J. Schleicher and SwedishAmerican Hospital, Defendants-Appellees). |
| District & No. | Second District<br>Docket No. 2-17-0218 |
| Filed | December 29, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 12-L-125; the Hon. J. Edward Prochaska, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Thomas G. Siracusa, of Power Rogers & Smith, LLP, of Chicago, for appellant.<br><br>Clausen Miller, P.C., of Chicago (Melinda S. Kollross, of counsel), for appellee David J. Schleicher.<br><br>Roger H. Gustafson and Michael J. Orsi, of Faulkner Gustafson, LLC, of Rockford, for other appellee. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Spence concurred in the judgment and opinion.


**OPINION**

In 2010, defendant, Dr. David J. Schleicher, who was employed by defendant, SwedishAmerican Hospital (SwedishAmerican), performed a laparoscopic hysterectomy on plaintiff, Lisa Swift. Schleicher perforated plaintiff's small bowel with three through-and-through holes. He failed to diagnose the perforations until four days later. Plaintiff developed sepsis, needed bowel resection surgery, and suffered additional complications requiring hospitalization and home health care. Plaintiff filed a malpractice suit. Defendants admitted that they caused the injury, but they argued that the injuries were not a result of negligence. The jury agreed. Plaintiff filed a motion for a new trial, which was denied. Plaintiff appeals, arguing that the trial court committed reversible error by (1) allowing evidence that plaintiff's expert, Dr. Robert Dein, caused a bowel injury in 1989, (2) allowing cumulative defense testimony, and (3) declining to find the verdict against the manifest weight of the evidence. We agree with plaintiff on the first point. Dein's testimony regarding the 1989 injury was not relevant to impeach or affirmatively elucidate his testimony concerning the 2010 standard of care. The admission of the improper evidence appears to have affected the outcome of the trial because it was not cumulative of any properly admitted evidence and because in closing defendants used the improper evidence to severely attack Dein's integrity and to conflate the issues to be decided by the jury. We briefly address the second argument to avoid its recurrence on remand. We need not address the third argument.

## I. BACKGROUND

The parties offer competing accounts of how plaintiff's injury occurred. According to defendants, while still at the limited-visualization stage of the surgery, Schleicher made one errant thrust while inserting the *umbilical* surgical port, or "trocar," resulting in multiple holes to a compressed (flattened), looped bowel that was adhered to the abdominal wall. According to plaintiff, after reaching the direct-visualization stage of the surgery, Schleicher made multiple errant thrusts while inserting and navigating the *left* trocar, resulting in multiple holes to a normal-anatomy bowel. And, even if the injury occurred while he inserted the umbilical trocar, Schleicher was negligent for failing to timely recognize the injury. Defendants all but concede that, if the injury happened as plaintiff posits, then Schleicher deviated from the standard of care. Therefore, the question of how the injury occurred, via the umbilical trocar or the left trocar, was of significant consequence to the jury's ultimate determination.

Plaintiff presented Dein as her only expert in support of her left-trocar theory. Schleicher and his assistant, Dr. David Moore, testified to the surgical incident. SwedishAmerican called one expert, Dr. Henry Dominicis, an obstetrician/gynecologist, to testify to the umbilical-trocar theory and the standard of care. Schleicher called two experts: Dr. Kim Sobinsky, a general surgeon, who testified to plaintiff's postoperative care and the ultimate

diagnosis of the perforated bowel, and Dr. Lewis Blumenthal, an obstetrician/gynecologist, who testified to the umbilical-trocar theory and the standard of care.

¶ 5   The experts submitted to depositions, with only Dein's being relevant on appeal.

¶ 6                               A. Dein's Deposition

¶ 7   In his deposition, Dein testified to the cause of the injury:

"Q. In your opinion, how did the injury occur?

A. *** [T]rocar perforations.

Q. Which trocar?

A. Well, I'm not a hundred percent certain. It—my initial thought is that it was the *[umbilical]* trocar because he had difficulty with the initial [umbilical trocar]. He tried probably multiple passes and couldn't get in. Then he tried a deeper one and was able to get in.

But when I reread his operative note, [which stated that] the *left* [trocar] had to be lowered to avoid omental adhesions, [I thought] that it's possible that he was having difficulty with the left-hand trocar and that's where the perforations occurred.

In either event, I'm quite certain it was a trocar perforation. ***

Q. Can you state to a reasonable degree of medical certainty whether it was the initial [umbilical] trocar that injured the small bowel or the placement of the left ancillary trocar?

A. *No.* Just that it was a trocar perforation." (Emphases added.)

¶ 8   Later in the deposition, Dein began to favor the left-trocar theory: "[T]he more I'm talking, the more I'm making myself believe—it was the left-hand port, not the—not the umbilical port, because it was a sharp instrument and there was omental adhesions in that area."

¶ 9   Additionally, Dein testified to a 1989 umbilical entry he performed that led to a bowel perforation. There, the entry was entirely blind, or by feel. The patient had a "distorted anatomy," in that her bowel stuck to her abdominal wall. Dein immediately recognized his mistake, and the patient underwent immediate corrective surgery. Dein was subject to a malpractice suit.

¶ 10   Following Dein's deposition, plaintiff moved *in limine* to bar cross-examination of Dein about the 1989 procedure. Plaintiff noted that, generally, experts should not be cross-examined about prior malpractice suits against them. *Mazzone v. Holmes*, 197 Ill. App. 3d 886, 897 (1990); *Webb v. Angell*, 155 Ill. App. 3d 848, 860 (1987); *Miceikis v. Field*, 37 Ill. App. 3d 763, 771 (1976). Defendants responded that the 1989 procedure was relevant to credibility in that Dein believed that he followed the standard of care but Schleicher did not under similar circumstances. *Schmitz v. Binette*, 368 Ill. App. 3d 447, 459 (2006). The trial court denied the motion, reasoning that the 1989 procedure was relevant to credibility. The defense would be allowed to question Dein about the 1989 procedure, but it would not be allowed to mention the associated malpractice suit. Plaintiff moved to reconsider, and defendants argued, for the first time, that Dein's testimony about the 1989 procedure was admissible as affirmative evidence of the standard of care. The trial court denied the motion, again reasoning that the 1989 procedure was relevant to credibility. It did not mention affirmative evidence.

¶ 11                                    B. Trial

¶ 12                                    1. Dein

¶ 13        At trial, Dein testified to (1) his own expertise; (2) the nature of the laparoscopic hysterectomy procedure; (3) plaintiff's medical history and injury; (4) why he believed that the injury was caused by the left, rather than the umbilical, trocar; (5) why he believed that Schleicher deviated from the standard of care under either operative scenario; (6) why he believed that Schleicher deviated from the standard of care postoperatively; and (7) the 1989 procedure.

¶ 14        Dein attended Johns Hopkins University and the University of Pennsylvania School of Medicine. He graduated from medical school in 1983, completed a four-year residency, and had practiced as an obstetrician and gynecologist ever since. He had performed numerous gynecological surgeries, including laparoscopic hysterectomies. He typically performs two to four gynecological surgeries every week.

¶ 15        Dein described plaintiff's procedure as a laparoscopic hysterectomy and removal of the left ovary. The procedure is performed by inserting three trocars: an umbilical trocar, a left trocar, and a right trocar. The umbilical trocar uses what is known as an Optiview, which allows for partial visualization while the umbilical trocar is inserted. After the umbilical trocar is inserted, a different camera is placed in the device, thereby providing full visualization for the remainder of the surgery. With full visualization, the left trocar and the right trocar are inserted. Dein agreed that there is risk with every surgery. With a hysterectomy, bowel perforation is a known risk.

¶ 16        Plaintiff's medical history put her at heightened risk. For example, plaintiff suffered from obesity. Additionally, plaintiff had five prior abdominal operations, including three cesarean sections and a gallbladder removal. This meant that plaintiff likely had scar tissue throughout her abdomen.

¶ 17        During the surgery, Schleicher perforated plaintiff's small bowel, leaving three separate through-and-through holes. Several days later, when the damaged portion of the bowel was removed, each hole was approximately one centimeter in diameter. While bowel perforation is a known risk, the type of bowel perforation that occurred here was a "surgical outlier." To Dein, three through-and-through perforations indicated negligence.

¶ 18        Dein believed that the injury occurred during the insertion of the left trocar because (1) Schleicher had trouble with the left-trocar entry and (2) the wounds corresponded with the size and sharpness of the left trocar. First, the left-trocar entry was complicated by omental adhesions. An omentum is a fatty, yellow apron. Surgeons do not want to go through the omentum because it contains blood vessels. Schleicher likely pierced the bowel while trying to avoid the omental adhesions. Second, the left-trocar tip is approximately five millimeters. When the damaged bowel was removed, each hole was approximately one centimeter, or twice the size of the tip. Dein would expect the holes to expand this much over a course of days. Also, the holes appeared to have been caused by a sharp instrument, such as the left trocar.

¶ 19        Dein believed that Schleicher acted negligently in navigating around the left omental adhesions. Instead of trying to go around the left omental adhesions, Schleicher should have chosen a different entry point. Choosing a different entry point is not advanced surgery; it is something surgeons do "all the time." Schleicher could have entered in a clear area, perhaps the upper cavity. Or, he could have used the umbilical and right trocars to "put laparoscopic

scissors in to *** cut that scar tissue, drop it away from the area of the left lower quadrant, and then if need be, go ahead and put the [left] trocar in."

¶ 20   Dein did not agree with the theory that the injury occurred during the umbilical-trocar entry and by striking a looped bowel. The tip of the umbilical trocar is pyramidal in shape and one centimeter in diameter. It is unlikely to have caused holes that were one centimeter when the damaged bowel was removed several days later. That would mean that the holes had not expanded at all, even as "bowel contents extrude[ed] profusely." Also, the bowel could not have been looped such that one errant thrust caused three through-and-through perforations because the damaged portion of the bowel was only 13 centimeters long. If such a relatively short portion of the bowel had been looped to that extent, plaintiff would have had prior bowel difficulties and obstructions. She did not. Also, the surgeons who performed the excision of the damaged bowel did not note that it was looped.

¶ 21   Nevertheless, Dein could not absolutely rule out that the injury occurred during the umbilical-trocar entry. Schleicher reported difficulty with the umbilical-trocar entry. He made multiple attempts at the entry. He initially used a standard-size trocar but then traded it out for a longer trocar.

¶ 22   Dein believed that Schleicher deviated from the standard of care even if the injury occurred during the umbilical-trocar entry. Again, three separate perforations were not within the normal risk. And, if the trocar had gone through a looped bowel in one thrust, it would have been "a large amount of tissue," which Schleicher should have noticed.

¶ 23   During cross-examination, Dein acknowledged that, in the beginning of his deposition, he could not state to a reasonable degree of medical certainty whether the injury was caused by the left or the umbilical trocar. "But then as the deposition went on ***, I specifically said that as we're talking about it, it seems more and more clear it's the left trocar." The defense asked:

> "Q. So your opinion actually evolved from the beginning of your deposition until the end of your deposition, true?
>
> A. No. My opinion got stronger. *** I knew it was a trocar injury.
>
> * * *
>
> A. I said that I couldn't state to within a reasonable degree of medical certainty, but I believed it was the left. And then as we discussed it, I felt stronger about it, yes."

¶ 24   Dein opined that Schleicher was negligent not only in causing the injury, but in failing to recognize it. During surgery, regardless of whether the bowel was compressed, Schleicher should have been able to see on the Optiview that he invaded the bowel. Had Schleicher performed an adequate inspection of the bowel region, he "certainly" should have seen signs of three through-and-through perforations. After surgery, plaintiff's condition worsened. While plaintiff's baseline kidney function was "not normal [but also] not terrible," her postoperative kidney function approached "failure." Her urine output shut down. Fluid pushed into her fat tissue instead of being processed by her kidneys. Schleicher should have ruled out medication as a cause for the kidney shutdown because the particular type of medication given to plaintiff, vasopressors, does not affect kidney function. Given that plaintiff had a hysterectomy, Schleicher should have suspected a perforated bowel when plaintiff exhibited kidney shutdown and "third spacing [of] fluid." These symptoms were obvious by December 15, 2010, but Schleicher did not recognize the bowel perforation until December 17, 2010. The

sooner Schleicher had recognized the problem, the less severe plaintiff's infection would have been.

¶ 25 During cross-examination, Dein acknowledged that Schleicher called in specialists to review plaintiff's symptoms in the days following surgery. Schleicher called in a nephrologist and ordered a CT scan. Schleicher continued to monitor plaintiff. On December 16, 2010, plaintiff told Schleicher that she felt "much better," and her urine output increased.

¶ 26 During redirect examination, Dein stated that the CT results were consistent with a bowel perforation. The results showed inflammation. Schleicher should have investigated further.

¶ 27 Dein testified to the 1989 procedure. In 1989, Dein performed a laparoscopic hysterectomy. In 1989, the procedure was new. No cameras were available for the entry. It was a "true blind," or by-feel, approach. Dein perforated the patient's large bowel during the initial umbilical entry. It was one puncture and not through-and-through. After he made the entry, he put in a camera, and he saw that he was inside the bowel. Right away, he called for additional doctors to perform corrective surgery. The patient had a "distorted anatomy," in that her large bowel adhered to her abdomen at the entry point. This was the only time that Dein ever injured a patient with a trocar.

¶ 28 During cross-examination, Dein again testified that, in 1989, he inserted an umbilical trocar into a patient's large bowel:

"Q. And the entry point was at the umbilicus?

A. Yes.

Q. Similar to this case—right?—for the initial entry point?

A. Entry was into the umbilicus, yes.

Q. And it's your testimony that it occurred because it was stuck to the underside of the umbilicus. As it turned out, her bowel was stuck to the entire abdominal wall; true?

A. Well, it occurred because it was stuck to the underside of the umbilicus. As it turned out, her bowel was stuck to the entire anterior abdominal wall.

Q. And you described this as, quote, very distorted anatomy?

A. Yes.

* * *

Q. And this was a direct trocar injury where the trocar you placed into the abdomen went right into the transverse colon—

A. Yes.

Q. —Right?

And in your opinion, in that situation during that procedure, you were not negligent when you injured this patient's bowel; right?

A. Yes."

¶ 29 Dein further testified that, over his entire career as a surgeon, he injured five patients' bowels. These procedures extended beyond hysterectomies and included cancer and endometriosis operations. (Plaintiff did not object to this line of questioning.) However, he injured a patient with a trocar only once, during the 1989 procedure.

¶ 30 During redirect examination, Dein was asked to clarify certain differences between the 1989 procedure and the instant procedure. Dein stressed that optics were not available in 1989. He performed a "true blind" entry. His procedure was different "in every way."

¶ 31    The court accepted witness questions from the jury, but the jury did not submit any questions about the 1989 procedure. Instead, the jury asked about the instant procedure, such as the range of vision during the umbilical entry. Dein explained that, as soon as the trocar is inserted, the Optiview is traded out for a camera. Also, the jury inquired as to the thickness of three sections of compressed bowel. Dein answered, "very good question," and explained that the compressed bowel would be about six centimeters thick. "It's not as though you're putting [the trocar] through paper *** and now you're out the other side. There's quite a bit of tissue involved when you're going through three distinct loops of bowel."

¶ 32                                                         2. Schleicher

¶ 33    Schleicher testified that he attended Rush Medical School and completed his residency at the University of Michigan. He specializes in obstetrics and gynecology, with a subspecialty in urogynecology and pelvic reconstructive surgery. He had been practicing medicine for 25 years, and he had performed approximately 500 laparoscopic hysterectomies. This was the only incident in which he had injured a patient with a trocar.

¶ 34    Schleicher testified to the insertion of the umbilical trocar. Generally, as he did here, he inserts the umbilical trocar before the left and right trocars. The umbilical trocar contains an Optiview device, which allows him to see the abdominal layers in a screen at the top of the trocar. The layers are distinct in appearance and color. Visualization is limited, and he cannot turn the Optiview up to look back at the point of entry. Nevertheless, here, he watched the screen continuously as he pressed through the abdomen. He did not feel any unusual resistance, nor did he see any injury. Moore would have been watching as well. Schleicher did, however, have to change trocars, as the first trocar was not long enough to get all the way inside the abdomen. Once the umbilical trocar was inserted, he traded out the Optiview for a laparoscope camera, which allows for better visualization. Still, it is difficult to see around the belly button.

¶ 35    Schleicher then inserted the left and right trocars. During the insertion of the left trocar, he saw an omental adhesion. He avoided it without difficulty. He twice stated that he was "absolutely" certain that he did not injure plaintiff during the insertion of the left trocar because he could "clearly see" the area. The right trocar was placed in a similar fashion.

¶ 36    During the surgery, he used the camera to check for signs of injury. He looked for perforations and for leaking fluid. Neither he nor Moore saw signs of injury. Similarly, he did not see any sign of injury during the removal of the trocars. He had no explanation for why three through-and-through perforations were later discovered. He did not believe that the scalpel he used to detach the ovary came into contact with any other organ. He did not see whether the bowel was adhered to the abdomen.

¶ 37    Postsurgery, Schleicher checked on plaintiff daily. The day of the surgery, plaintiff had problems with urine output and blood pressure. Schleicher requested that a nephrologist and an intensive-care physician examine plaintiff. Neither of them discovered the bowel perforations. Two days after the surgery, on December 15, 2010, Schleicher ordered a CT scan. The CT scan showed mild to moderate fluid and air in subcutaneous space, but it did not show signs of perforation. Three days after the surgery, plaintiff reported feeling better and had increased urine output. She did not have a fever or an elevated blood count, which would be consistent with a perforation. Four days after the surgery, plaintiff experienced worsened pain, which led to her diagnosis.

¶ 38    Schleicher testified that he met the standard of care. He based his statement on his "25-plus years of surgical experience, [his] technique, the care [he] [took], the gentle taking care of tissue, [and] the attention to detail that [he] and [Moore] use[d]." Bowel perforation is a known risk of a laparoscopic hysterectomy and can occur absent negligence. Schleicher informed plaintiff of the risk of bowel perforation. He considered her to be at higher risk for injury because she was likely to have adhesions near the uterus, cervix, and bladder due to prior caesarean sections.

¶ 39    Although Dein testified that the perforations were caused by a sharp instrument, Schleicher considered the left trocar to be a dull instrument.

¶ 40    Schleicher testified to the bowel's diameter. He stated that, if there is no waste in the bowel, it can be flaccid like a ribbon. In such a state, it can be "very thin," and he demonstrated with his fingers for the jury. ("If you look at between my fingers, it's about like that.") During cross-examination, Schleicher testified that he believed that plaintiff's small bowel would still "work" even if it was looped and adhered to the abdominal wall. Later, the jury asked Schleicher to clarify the diameter of the bowel. He stated that, because plaintiff had not eaten for 8 to 10 hours, it was likely flat. Even looped, Schleicher stated the total thickness would be no more than two centimeters, not six as suggested by Dein.

¶ 41                                  3. Moore

¶ 42    Moore, Schleicher's assistant during plaintiff's surgery, had been licensed in medicine since 1988. He is a gynecologist. He testified that hysterectomy procedure changed greatly between 1983, when he began his residency, and today. In the 1980s only about 10% of hysterectomies were laparoscopic, but today 90 to 95% are laparoscopic.

¶ 43    Moore had no independent recollection of plaintiff's surgery. Typically, he looks for signs of injury during surgery and reports them when seen. If plaintiff's injury had been caused by the left trocar, he should have been able to see it. Nothing in the operative report indicated an unusual surgical occurrence.

¶ 44                    4. SwedishAmerican's Expert: Dominicis

¶ 45    Dominicis testified through video deposition that he attended the University of Illinois Medical School and had been practicing obstetrics and gynecology for 26 years.

¶ 46    Dominicis testified to the cause of the injury. In his view, the injury occurred during the insertion of the umbilical trocar, which left three through-and-through perforations in a compressed, looped, and adhered bowel. In support of his position that the umbilical trocar pierced a looped bowel, Dominicis noted that this explained why there was no leakage from the colon during the surgery. The trocar itself blocked the leakage, and because the bowel was looped, each hole was blocked at once. In support of his position that the umbilical trocar pierced an adhered bowel, Dominicis noted that the operative report of the removal of the bowel indicated that there was "finger fracturing of adhesions upon entering the abdomen." Dominicis stated that, "at that point, my understanding from [the] report is that there was bowel adhered to the abdominal wall." Dominicis acknowledged during cross-examination that the report did not expressly state that the bowel had been adhered to the abdominal wall.

¶ 47    Dominicis disagreed that the injury occurred during the insertion of the left trocar. The small bowel generally does not reside in the region where Schleicher inserted the left trocar.

The size of the holes, one centimeter, did not match the size of the left trocar. Also, Dominicis did not believe that two physicians, who had the benefit of full visualization, would have failed to recognize an injury involving three separate through-and-through holes that were not plugged by a trocar.

¶ 48 Dominicis opined that Schleicher did not violate the standard of care in piercing a compressed, looped, and adhered bowel. He explained that, typically, it is safest to use the umbilical entry as the first entry. This is what Schleicher did. However, that initial entry into the abdomen offers only partial visualization. Further, it can be difficult to visualize entry into a compressed bowel. Bowel perforation is a known risk of laparoscopic procedures and can occur absent negligence.

¶ 49 Similarly, Schleicher did not violate the standard of care in failing to recognize the injury during the surgery. Because the bowel was looped on itself and adhered to the abdomen, the trocar remained in position during the surgery, blocking leakage and preventing visualization of the injury.

¶ 50 And, Schleicher did not violate the standard of care in failing to recognize the injury after the surgery. Prior to the day the condition was diagnosed, plaintiff's symptoms were consistent with a normal recovery. For example, although the CT scan performed two days after the procedure showed fluid, this was consistent with recovery. The next day, plaintiff even reported feeling better. It was not until the second CT scan, performed four days after the procedure, that the level of fluid suggested a bowel perforation. It was possible that adhesions within the abdomen influenced the rate of plaintiff's leakage, allowing for greater leakage when the bowel shifted over time and moved away from the adhesions.

¶ 51                                5. Schleicher's First Expert: Sobinsky

¶ 52 Sobinsky attended the University of Illinois Medical School. He is a general surgeon, and he had been certified since 1987. He performs approximately two colon or small-bowel resections per week.

¶ 53 Sobinsky did not offer an opinion on the cause of the injury. Rather, he testified only to postsurgical recognition of the injury. Symptoms of a small-bowel perforation would be abdominal pain, bloating, tenderness, vomiting, and fever. Diagnostic tests include performing white blood cell counts, X-rays, and CT scans. CT scans, which Schleicher ordered, are more sophisticated than X-rays. Prior to the date of diagnosis, none of the test results indicated a bowel perforation. Rather, they were consistent with a typical recovery. In fact, plaintiff's white blood cell count actually went down on the second day. Additionally, because plaintiff's low urine output began immediately after the surgery, it was more likely due to normal dehydration than infection, which would take longer to manifest a symptom. To a reasonable degree of medical certainty, Sobinsky opined that the injury was timely diagnosed.

¶ 54 During cross-examination and redirect examination, Sobinsky testified to a laparoscopic gallbladder removal that he performed. In that surgery, he injured a compressed, adhered bowel when trying to move it. However, he recognized the injury immediately. He saw the distinctive mucosa layer of the bowel and knew that he had pierced it.

¶ 55                          6. Schleicher's Second Expert: Blumenthal

¶ 56        Blumenthal specialized in obstetrics and gynecology. Plaintiff moved in writing to bar
Blumenthal's testimony as cumulative of Dominicis's testimony, not Sobinsky's. (In argument, plaintiff added Sobinsky, noting that Sobinsky testified to the standard of care in diagnosing the injury.) Plaintiff acknowledged that Dominicis was SwedishAmerican's expert, not Schleicher's, but she argued that the court had discretion to bar the testimony because defendants shared an agency relationship and had aligned interests.

¶ 57        The court denied the motion to bar Blumenthal's testimony as cumulative. It explained that each defendant was entitled to its own expert. Sobinsky did not testify to the standard of care during the procedure, so Blumenthal's standard-of-care testimony was not as duplicative as plaintiff claimed. Further, plaintiff's timing was poor. If plaintiff had moved *in limine* to bar multiple experts from testifying to the standard of care, then defendants could have chosen which expert they wanted to present. Blumenthal was allowed to testify.

¶ 58        Blumenthal testified that he had practiced obstetrics and gynecology since 1982. He is on staff at several hospitals, including Northwestern, and he teaches the procedure at issue to residents.

¶ 59        Blumenthal testified to the procedure generally. The surgeon first inserts the umbilical trocar. The tip of the umbilical trocar is referred to as pyramidal, and it is shaped like an upside down acorn. The umbilical trocar utilizes the Optiview, which allows the surgeon to visualize the layers as he pushes through them. Once the umbilical trocar is inserted and the Optiview is traded for a camera, the surgeon can see the "whole process" within the cavity four to five inches in front of him. When inserting the left and right trocars, the surgeon gains full visualization, not just of the layers immediately in front of him. When inserting the left and right trocars, the surgeon can see from a remote vantage point whether a trocar tip is about to touch the bowel.

¶ 60        Blumenthal testified to the cause of the injury. In his opinion, the injury occurred during the insertion of the umbilical trocar. The trocar passed through a looped, or S-shaped, bowel that was stacked upon itself like pancakes. The 13-centimeter section of affected bowel was long enough to be S-shaped. Further, the bowel was compressed, and the thickness of two compressed walls is about three to four *milli*meters. The looped, compressed bowel was also adhered to the abdominal wall.

¶ 61        Blumenthal asserted that his causation explanation was the "simplest" and "most logical" because it accounted for the multiple through-and-through perforations and the stasis of the bowel while being punctured. If the bowel had not been adhered, the trocar could have moved the bowel out of the way. Blumenthal also accounted for why no leakage was observed during the surgery. The sleeves of the trocar pressed against the bowel, after its tip continued past the bowel, and prevented its contents from leaking.

¶ 62        Blumenthal acknowledged that Schleicher's operative report did not reference an adhesion. However, the excision report referenced indicators of adhesion. For example, it referenced an omental adhesion in the "nearby vicinity" of the umbilicus. Also, it referenced bile-stained subcutaneous tissue "right under" the umbilicus. Bile-stained tissue can appear in the area where a cut bowel has leaked its contents.

¶ 63        During cross-examination, plaintiff challenged Blumenthal's causation theory, asking about the resistance Schleicher should have felt going through multiple layers of bowel.

Blumenthal responded: "What is not being stated is that some of the layers are extremely thin like tissue paper." Plaintiff also asked about the absence of express documentation of a compressed, looped, and adhered bowel. Blumenthal explained again that the operative reports *did* indicate a compressed, looped, and adhered bowel. He quoted the following passage from the excision report: "I was able to break up all loculated and connected loops of small intestine and begin running the small bowel."

¶ 64 Blumenthal opined that Schleicher complied with the standard of care in "the way he performed the surgery, the techniques that he used, and the precautions taken to prevent *** the injury." It is "very difficult" to diagnose an adhered bowel prior to the initial incision. The extent of the injury did not change his opinion:

> "Q. Does the extent of the perforations, the three through-and-through perforations affect your opinions with respect to the standard of care?
>
> A. No, it does not.
>
> Q. Why not?
>
> A. Because to me it's explainable with one fluid motion, and it is a known complication of the procedure."

¶ 65 Blumenthal stated that at least one other incision method was available to Schleicher. That is, he could have entered the umbilicus with a bladed trocar, rather than the Optiview. This would have been a blind entry. Given plaintiff's unusual anatomy, she "definitely" would have been injured with that approach, too. Schleicher's very selection of the Optiview supported that he was a reasonably careful physician.

¶ 66 Similarly, Schleicher did not violate the standard of care in failing to recognize the injury during the surgery. Again, the umbilical trocar sleeve pressed against the bowel to prevent the contents from leaking. Thus, the usual indicators were absent.

¶ 67 And, Schleicher did not violate the standard of care in taking four days to recognize the injury. In that time, Schleicher checked in daily with plaintiff. He consulted with specialists in nephrology, critical care, and general surgery. He ordered two CT scans, one on day two and one on day four. Many of plaintiff's symptoms mirrored normal recovery. In fact, certain symptoms refuted a bowel injury, such as a low white blood cell count and a soft abdomen. Two days after the surgery, plaintiff reported feeling better. On the fourth day, she saw an infectious-disease specialist. The infectious-disease specialist reported that plaintiff's symptoms were unusual: "This is a difficult patient. She is remarkably non-toxic." Given these circumstances, Schleicher timely diagnosed plaintiff.

¶ 68                                      7. Closing Argument and Subsequent Rulings

¶ 69 During closing argument, the parties recounted the evidence supporting their causation theories. To refute plaintiff's theory, Schleicher argued, in large part, that Dein was not credible. Schleicher noted that Dein changed his causation theory mid-deposition. First, Dein stated that it was either the umbilical or the left trocar. Then Dein stated that it was the left trocar. Schleicher further argued:

> "So let's talk about the only person in this case who has come in this courtroom and criticized Dr. Schleicher. ***
>
> ***
>
> I'd like to go through some credibility issues with Dr. Dein. ***

*** [T]he [theory] of the left port is cut from whole cloth. It's pure fabrication. *** I believe this is why.

*** I believe he came up with this theory because he knew that *he had done the exact same thing*. And when you consider what he did versus in comparing it to this case, I think you are going to arrive at the same conclusion as I have.

In that [(1989)] situation, Dr. Dein said he inserted the umbilical trocar into the patient's transverse colon which was stuck to the abdominal wall which he describes as, quote, distorted anatomy. Remember, he became aware of it because he could see he was directly in the large bowel. He can try to distinguish that all he wants, but *it's the same thing*.

I'd also like to point out to you that during cross-examination [(about the 1989 procedure)] he was asked—and, by the way, *in his [(1989)] circumstance, he complied with the standard of care, but not here. Again, credibility*. Think about his credibility when considering his testimony because he's the only one who has come in here and criticized Dr. Schleicher.

So[,] remember when he was asked about *other instances where he's perforated the small bowel*. At first he tried to deny it, but then *he knew he was caught*. ***

*** Not only is this a credibility issue, it is the *height of hypocrisy for him to come in and question Dr. Schleicher*." (Emphases added.)

¶ 70 SwedishAmerican used the 1989 procedure not only to impeach Dein's standard-of-care testimony but also to support its theory of causation: "I'm going to show *** you *** the depiction of the defense experts' belief of how this injury occurred ***. Here is why I think this is the most reasonable and logical explanation, because it happened to Dr. Dein, too."

¶ 71 The jury returned a verdict in favor of defendants. Plaintiff filed a motion for a new trial, arguing that the trial court erred in allowing Dein to testify to the 1989 incident and in allowing Blumenthal's cumulative testimony. Additionally, plaintiff argued that the verdict was against the manifest weight of the evidence.

¶ 72 The trial court denied the motion. It stated that the 1989 incident was relevant to Dein's credibility *and* was affirmative evidence of the standard of care. It acknowledged that it had not admitted the evidence on the latter basis, but it stated that this provided an "alternative basis" for it to now find that its ruling had been correct. Further, the court stated that, even if it had erred, a new trial would not be warranted. Nevertheless, in addressing the manifest-weight argument, it acknowledged that the jury might reasonably have returned a verdict for either side: "It was, you know, an interesting trial. There were experts on both sides. Certainly, the verdict was not against the manifest weight of the evidence. I could certainly see where the jury could decide this case in favor of the defendants, and [it] did." This appeal followed.

¶ 73                                      II. ANALYSIS

¶ 74 On appeal, plaintiff argues that the trial court committed reversible error in (1) admitting evidence that Dein caused a bowel injury in 1989, (2) allowing Blumenthal's cumulative testimony, and (3) declining to find the verdict against the manifest weight of the evidence. We agree with plaintiff's first argument, we briefly reject her second argument, and we do not

address her third argument.

¶ 75                                    A. 1989 Procedure

¶ 76        Plaintiff argues that the trial court abused its discretion in denying the motion *in limine* to bar the cross-examination of Dein with respect to the 1989 incident. Plaintiff argues that Dein's "personal-practice" testimony was not relevant to impeach his standard-of-care testimony and caused undue prejudice. Defendants disagree. Additionally, defendants urge that Dein's personal-practice testimony was relevant in that it provided affirmative evidence of the 2010 standard of care. For the reasons that follow, we agree with plaintiff.

¶ 77                                    1. Black Letter Law

¶ 78        Only relevant evidence may be admitted at trial. *Gaston v. Founders Insurance Co.*, 365 Ill. App. 3d 303, 323 (2006); see also Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the lawsuit more or less probable than it would be without the evidence. *Downey v. Dunnington*, 384 Ill. App. 3d 350, 381 (2008); see also Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence may, nevertheless, be excluded if it is unfairly prejudicial or has the potential to mislead the jury. *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 97 (2008); see also Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 79        We review a trial court's evidentiary ruling on a motion *in limine* regarding the admissibility of personal-practice testimony for an abuse of discretion. *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23. Similarly, we review a trial court's determination of the scope of cross-examination for an abuse of discretion. *Schmitz*, 368 Ill. App. 3d at 452; see also Ill. R. Evid. 611(b) (eff. Jan. 1, 2011). A court abuses its discretion when no reasonable person would take its position. *Schmitz*, 368 Ill. App. 3d at 452. If the court abused its discretion in admitting the evidence, we will order a new trial only if the improperly admitted evidence "appears to have affected" the outcome of the trial. *Gunn v. Sobucki*, 216 Ill. 2d 602, 613 (2005) (bench trial); *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 243 (1988) (jury trial).

¶ 80        In medical negligence cases, the plaintiff, through the use of experts, must establish the standard of care against which the defendants' conduct is to be measured. *Schmitz*, 368 Ill. App. 3d at 452; see also Ill. R. Evid. 702 (eff. Jan. 1, 2011). The standard of care required of a medical professional is to " 'possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified [medical professional] practicing in the same or similar localities under the circumstances similar to those shown by the evidence.' " *Schmitz*, 368 Ill. App. 3d at 453 (quoting Illinois Pattern Jury Instructions, Civil, No. 105.01 (2005), and citing *Bryant v. LaGrange Memorial Hospital*, 345 Ill. App. 3d 565, 575 (2003)).

¶ 81        Personal-practice testimony is testimony by a medical expert concerning how he himself typically performs the treatment at issue. *Id.* at 459-61. Personal-practice testimony is not universally admissible. See *id.* Rather, personal-practice testimony is admissible if it is relevant to the credibility of an expert testifying to the standard of care or, in limited instances, if it affirmatively elucidates the expert's opinion of the standard of care. *Id.*

¶ 82                    2. Impeaching the Expert's Standard-of-Care Testimony

¶ 83         An expert's standard-of-care testimony may be impeached by his personal practices. *Id.*;
see also Ill. R. Evid. 607 (eff. Jan. 1, 2011). To be relevant for impeachment, personal-practice
testimony need not outright contradict standard-of-care testimony. *Schmitz*, 368 Ill. App. 3d at
461. Rather, personal-practice testimony need only be inconsistent with standard-of-care
testimony. *Id.* The trial court may consider the degree and direction of the disparity when
deciding whether to admit the personal-practice testimony. See *id.* at 459. For example, an
expert whose personal practices are wholly different or who personally performs *less* than his
estimation of the standard of care is more readily impeached than an expert who personally
performs *more* than his estimation of the standard of care. *Id.* Still, any disparity between
personal-practice testimony and standard-of-care testimony can be relevant to a jury charged
with deciding which expert to believe. *Id.*

¶ 84         Two cases, *Taylor* and *Schmitz*, best demonstrate what it means for an expert's
personal-practice testimony to be "inconsistent with" his standard-of-care testimony so as to
be relevant for impeachment.


¶ 85                                     a. *Taylor*

¶ 86         In *Taylor*, 2011 IL App (1st) 093085, relied upon by plaintiff, the plaintiff alleged that the
defendants' treatment of her inflammatory muscle condition, polymyositis, fell below the
standard of care and left her permanently disabled. In deposition, a defense expert testified to
the standard of care, stating that there were several acceptable ways to treat polymyositis.
According to the expert, defendants used one acceptable method. The expert personally
preferred a different acceptable method. The defendants moved, *in limine*, to bar
cross-examination of the expert on his personal practices. In their view, the expert's personal
practices were not relevant to his credibility. The trial court agreed, granted the motion, and
barred the personal-practice testimony.

¶ 87         At trial, the expert testified to the standard of care, again stating that there was "no one
right way" to treat polymyositis. He listed six acceptable methods. In his view, the defendants
used one of the acceptable methods. The plaintiff was not allowed to cross-examine the expert
on his personal practices in treating polymyositis.

¶ 88         On appeal, the plaintiff argued that the court erred when it did not allow her to impeach the
expert's standard-of-care testimony with his personal-practice testimony. The appellate court
rejected her argument, explaining:

        "[The expert's] preference to use one of the [several] treatment options that he opined
        is within the standard of care to treat polymyositis does not give rise to permissible
        impeachment testimony. [His] preference for one method is *not inconsistent* with his
        testimony that [several] treatment options exist, including his preferred option and the
        option used by defendants." (Emphasis added.) *Id.* ¶ 27.

Because the expert's personal-practice testimony was not inconsistent with his
standard-of-care testimony, it was not relevant for the purpose of impeachment and the trial
court did not err in excluding it. *Id.*

### b. *Schmitz*

In *Schmitz*, 368 Ill. App. 3d at 448, relied upon by defendants, the plaintiff alleged that the defendants' performance of a bladder suspension procedure fell below the standard of care. Her theory of the case was that the defendant-gynecologist's failure to perform the indigo-carmine test during the initial surgery to look for an obstruction ultimately led to the loss of her kidney. In deposition, a defense expert testified to the standard of care, stating that it did not require the use of the indigo-carmine test. Nevertheless, the expert, a urogynecologist, used the test " 'readily' " and " 'quite commonly' " in his own practice, because he was a " 'compulsive SOB who *** [was] too afraid not to.' " *Id.* at 451. The plaintiff asked for clarification: " 'So *** you're saying, it's a standard of care for yourself but you don't believe [it's] a standard of care for the industry?' " *Id.* The expert answered that it was a standard of care for a urogynecologist like himself, but not for a gynecologist like the defendant. *Id.* at 452.

The plaintiff moved, *in limine*, to be allowed to cross-examine the defendants' expert on his personal use of the indigo-carmine test. The plaintiff represented that she would not question the defendants' expert regarding his use of the test to establish the standard of care; she would use her own expert to establish the standard of care. Rather, she would question the defendants' expert regarding his use of the test to challenge his credibility. The trial court denied the motion, noting that the defendants' expert " 'does *more* than the standard of care.' " (Emphasis added.) *Id.* at 451.

At trial, the defendants' expert testified to the standard of care, again stating that it does not require gynecologists to use the indigo-carmine test. In fact, he testified that the test was dangerous and ineffective. It increased the risk of infection, allergic reaction, and laceration of the urethra. For all that risk, the procedure still failed to illuminate an obstruction 50% of the time because obstructions often occurred too late, after the initial surgery.

On appeal, the plaintiff argued that the trial court erred when it denied her the opportunity to impeach the defendants' expert's standard-of-care testimony with his personal practices. Plaintiff urged that personal-practice testimony is properly admitted when it is used for impeachment purposes.

The appellate court agreed with the plaintiff. *Id.* at 461. It disagreed with the trial court that, where an expert does more than required by his assessment of the standard of care, his personal-practice testimony can never be used to impeach his position. *Id.* at 459. Rather, the jury was entitled to hear that the expert's routine use of the indigo-carmine test was, at a minimum, "inconsistent with" his testimony that the test was not required by the standard of care. *Id.* at 461. Moreover, knowing that he would not be questioned on his own use of the test, the expert went so far as to add that the test was dangerous. *Id.* The plaintiff could have impeached the expert on the issue of danger, had she been able to question him about his own practices. *Id.* Because the expert's personal-practice testimony was inconsistent with his standard-of-care testimony, it was relevant for the purpose of impeachment and the trial court erred in excluding it. *Id.*

### c. The Instant Case

Here, as in *Taylor*, Dein's personal-practice testimony was not inconsistent with his standard-of-care testimony. Dein testified that, in 1989, he injured a patient by piercing an adhered bowel during a true-blind insertion of the umbilical trocar. He recognized the injury before he pierced through to the other side of the bowel, and he called for immediate repair. In

his opinion, he complied with the 1989 standard of care for a true-blind laparoscopic hysterectomy.

¶ 97    Dein's standard-of-care testimony can be considered in two parts. First, we can consider his primary opinion that Schleicher deviated from the standard of care when he (1) injured plaintiff by thrice piercing, through-and-through, a nonlooped bowel during a full-vision insertion of the *left* trocar; (2) did not recognize the injury at any point during the surgery; and (3) did not diagnose the injury in the four days that followed. Second, we can consider his alternate opinion that, even if Schleicher injured plaintiff during the limited-vision insertion of the *umbilical* trocar, hitting a looped bowel, he deviated from the standard of care when he (1) failed to immediately recognize the perforation during the surgery, particularly given the large mass of tissue he would have pierced in such a scenario, and (2) failed to diagnose it in the four days that followed.

¶ 98    We first consider Dein's primary opinion that Schleicher deviated from the standard of care when he injured plaintiff during the insertion of the left trocar. As we will explain, Dein's personal-practice testimony had no arguable relevance to credibility or impeachment of his primary opinion. We chart the key differences detailed in each portion of testimony.

|  | Primary Opinion | Personal-Practice Testimony |
|---|---|---|
| Year | 2010 | 1989 |
| Entry | Left | Umbilical |
| Vision | Full | True blind |
| Injury | Three errant thrusts | One errant thrust |
|  | Three through-and-through holes | No through-and-through hole |
| Anatomy | Normal | Adhered bowel |
| Recognition | Fail during surgery | Immediate |
|  | Fail for four more days |  |

¶ 99    Looking to this chart, it is clear that Dein's personal-practice testimony was irrelevant to impeach his primary opinion. Again, Dein primarily opined that Schleicher was negligent during three stages: insertion, recognition during the surgery, and recognition after the surgery. Dein's personal-practice testimony did not impeach any of these three points. As to insertion, Dein did not testify inconsistently when he opined that he complied with the standard of care in inserting the umbilical trocar but that Schleicher did not comply with the standard of care in inserting the left trocar. The two insertions were at different stages of the surgery, performed with visualization levels at opposite ends of the spectrum and on patients with different anatomies, resulting in different injuries. As to recognition, Dein did not testify inconsistently when he opined that he complied with the standard of care in recognizing the injury during the surgery but that Schleicher did not. Dein recognized the injury immediately, and Schleicher did not recognize it at all. Finally, it should go without saying that Dein's personal-practice testimony had no bearing on the issue of postsurgical recognition. Because Dein recognized the injury immediately, there was no postsurgical point of comparison.

¶ 100    We next consider whether Dein's personal-practice testimony was relevant to impeach his alternate opinion that, even if Schleicher injured plaintiff while inserting the umbilical trocar, he deviated from the standard of care in failing to recognize the injury during the surgery and in the four days that followed. We again chart the key differences detailed in each portion of testimony.

|            | Alternate Opinion            | Personal-Practice Testimony   |
| ---------- | ---------------------------- | ----------------------------- |
| Year       | 2010                         | 1989                          |
| Entry      | Umbilical                    | Umbilical                     |
| Vision     | Limited                      | True blind                    |
| Injury     | One errant thrust            | One errant thrust             |
|            | Three through-and-through holes | No through-and-through hole |
| Anatomy    | Looped, adhered bowel        | Adhered bowel                 |
| Recognition | Fail during surgery         | Immediate                     |
|            | Fail for four more days      |                               |

¶ 101    Admittedly, under Dein's alternate theory, both injuries occurred during the umbilical insertion, lacking full vision, and, with one errant thrust, hitting an adhered bowel. At first blush, these similarities seem relevant to impeach Dein's statement that he followed the standard of care while Schleicher did not. However, to hold as much would be to miss the point that Dein did *not* opine that the injury occurred during the umbilical insertion. Rather, he could not absolutely rule it out and merely offered up a hypothetical concession as a foundation for his "even if" opinion. That is, even if Schleicher injured plaintiff during the umbilical insertion with one errant thrust hitting a looped, adhered bowel, he deviated from the standard of care in failing to *recognize* the injury.

¶ 102    When we consider that Dein's alternate theory of negligence was based on a recognition failure, it becomes clear that there was no inconsistency in his statement that he followed the standard of care while Schleicher did not. As we have discussed, during the surgery, Dein recognized the injury immediately while piercing only a single wall, whereas Schleicher did not recognize the injury at all, even while pushing through three looped tubular structures of, in Dein's view, significant thickness. Defendants do not appreciate that, to be relevant for impeachment, Dein's testimony regarding the 1989 incident must be inconsistent with *his* standard-of-care testimony. It does not matter that Dein's testimony that he complied with the standard of care while Schleicher did not was inconsistent with *defendants'* theory that Schleicher pierced through paper-thin layers. And again, because Dein recognized the injury immediately, his personal-practice testimony had no bearing on his opinion of Schleicher's alleged postsurgical failure.

¶ 103    For the reasons stated, Dein's personal-practice testimony was not inconsistent with his standard-of-care testimony. Therefore, it was not relevant for purposes of impeachment, and the trial court should not have allowed it.

¶ 104                    3. Affirmative Evidence of 2010 Standard of Care

¶ 105    As an alternative basis to support the trial court's decision, defendants argue that Dein's personal-practice testimony was relevant to establish the 2010 standard of care. Defendants first raised this argument as an afterthought, postruling and in response to plaintiff's motion to reconsider. Defendants generously read *Schmitz* for the proposition that personal-practice testimony can be used as affirmative evidence of the standard of care, when, in actuality, that case was predominantly about impeachment. See *Schmitz*, 368 Ill. App. 3d at 461. Contrary to defendants' position, a party does not have *carte blanche* to establish the standard of care through personal-practice testimony. For example, a party cannot establish the standard of care *solely* through personal-practice testimony. *Id.* Implied in the bar against personal-practice

testimony as a sole source is that it can be a supplementary source. In any event, here, we disagree that Dein's testimony implicating the 1989 standard of care had any bearing on the 2010 standard of care.

¶ 106    Standard-of-care testimony, by its nature, pertains to the standard of care at the time of the treatment at issue. See, *e.g.*, *Smith v. South Shore Hospital*, 187 Ill. App. 3d 847, 856 (1989) (1983 standards inapplicable to establish a standard of care for a 1979 treatment); *Hirn v. Edgewater Hospital*, 86 Ill. App. 3d 939, 948 (1980) (testimony of the plaintiff's expert failed to establish applicable standard of care, in that his testimony pertained not to the accepted or customary medical standards at the time or place of the plaintiff's treatment, but rather only to the standard followed by his medical institution); *cf. Kobialko v. Lopez*, 216 Ill. App. 3d 340, 347 (1991) (critiquing an appellee's reliance on *Hirn*'s time requirement, where the facts of *Hirn* related more to place, but nevertheless adopting the general principle that the standard of care refers to the standard of care at the time of treatment).

¶ 107    An expert's standard-of-care testimony that draws from a different time can be relevant if the evidence shows that the treatment has not changed. See *Flynn v. Edmonds*, 236 Ill. App. 3d 770, 790 (1992) (testimony of the expert witness regarding the standard of care was admissible even though he was still in residency at time of the treatment at issue because he testified that treatment had not changed); *Kobialko*, 216 Ill. App. 3d at 347 (where expert based his opinion of the 1981 standard of care on his experience from the mid-1970s to 1990, and where nothing in the record indicated that the standard of care changed significantly from the 1981 occurrence date to 1990, the expert should have been allowed to testify to the standard of care).

¶ 108    Here, it was unreasonable to allow testimony addressing the 1989 standard of care to affirmatively establish the 2010 standard of care. Unlike in *Flynn* and *Kobialko*, the evidence in this case indisputably showed that the standard of care changed greatly over those decades. Dein and Moore each testified, and no witness disagreed, that, in 1989, the laparoscopic hysterectomy procedure was in its infancy. It was not until the mid-1990s that the procedure, and the expected expertise of the physicians performing it, began to approximate what they were in 2010.

¶ 109    We have determined that Dein's personal-practice testimony as to 1989 was not relevant to impeach or affirmatively elucidate his testimony on the 2010 standard of care. Given that the testimony had no probative value, our analysis of the error could end here. However, we choose to briefly comment on its prejudicial impact. This case is unlike any of the personal-practice cases cited by the parties, in the sense that the testimony here involved a single prior incident rather than a general statement of personal practices. *Cf. Taylor*, 2011 IL App (1st) 093085; *Schmitz*, 368 Ill. App 3d 447.

¶ 110    Also, as stressed by plaintiff at oral argument, the single prior incident resulted in injury. The evidence that Dein injured a patient had a prejudicial impact whether or not the jury learned that Dein was sued for the 1989 incident. Courts generally disfavor as irrelevant and unduly prejudicial the cross-examination of expert witnesses regarding their personal involvement as defendants in malpractice actions. See, *e.g.*, *Mazzone*, 197 Ill. App. 3d at 897; *Webb*, 155 Ill. App. 3d at 860 (cross-examination precluded even where malpractice suit then pending against the expert involved the "same issue," thus having the potential to expose his bias toward a certain result); *Miceikis*, 37 Ill. App. 3d at 771 (a medical expert's personal involvement as a defendant in a malpractice case was of "questionable relevance" when weighing the doctor's testimony regarding the standard of care at issue). We are not convinced

that the exclusion of evidence that Dein was sued for the 1989 incident sufficiently ameliorated the prejudice incurred when the jury was told that plaintiff's standard-of-care expert injured a patient.

¶ 111    Having found that the trial court abused its discretion in allowing Dein to be cross-examined on the 1989 incident, we now address whether the error warrants reversal. Again, a new trial is warranted when the improperly admitted evidence appears to have affected the outcome of the trial. *Tzystuck*, 124 Ill. 2d at 243. In deciding whether to grant a new trial, courts may consider whether the jury received a limiting instruction, whether the overall evidence was closely balanced, and whether the improperly admitted evidence bore on a critical issue, was cumulative of properly admitted evidence, or was used in closing argument. See *People v. Miller*, 302 Ill. App. 3d 487, 493-94 (1998). Where the question of liability is sufficiently close so that a jury might reasonably return a verdict for either party, an attorney's improper influence upon the jury may require a reversal. *Lee v. Calfa*, 174 Ill. App. 3d 101, 111-13 (1988) (outrageous attack on the integrity of the insured's expert witness during closing argument thwarted the orderly administration of justice and, combined with an instructional error, warranted a new trial). Considering these factors, we believe that a new trial is warranted.

¶ 112    The testimony about the 1989 incident was not cumulative of any other evidence. Although properly characterized as personal-practice testimony, it came extraordinarily close to the highly disfavored malpractice testimony. Defendants compounded the error by stressing it in closing argument and using it improperly to attack Dein's character: "So remember when he was asked about other instances where he's perforated the small bowel. At first he tried to deny it, but then he knew he was caught." In that statement, defendants used the testimony to denigrate Dein for having previously injured a patient. Also, they stated that the testimony proved that Dein lacked credibility. How could Dein opine that defendants deviated from the standard of care in 2010, when he did the "same thing" in 1989? "Not only is this a credibility issue, it is the height of hypocrisy for him to come in and question Dr. Schleicher." As in *Lee*, an unfair attack on the integrity of an expert—here, plaintiff's only expert—interfered with the orderly administration of justice. *Id.*

¶ 113    The trial court offered no limiting instruction. Thus, to make matters worse, defendants used the testimony about the 1989 incident not only in relation to the standard of care during the surgery but also to argue that it supported their causation theory: "[In 1989] Dein said he inserted the umbilical trocar directly into the patient's transverse colon [which was adhered due to] distorted anatomy. *** He can try to distinguish that all he wants, but it's the same thing." Still worse: "I'm going to show *** you *** the depiction of the defense experts' belief of how this injury occurred ***. Here is why I think this is the most reasonable and logical explanation, because it happened to Dr. Dein, too." A determination on the manner in which the injury occurred was virtually determinative of whether Schleicher negligently perforated the bowel. There was no direct evidence that plaintiff's bowel adhered to her abdomen, yet establishing that plaintiff's bowel adhered to her abdomen was critical to defendants' theory of the case. To get there, defendants encouraged the jury to make an improper inference, by misleading it to think that how the 1989 injury occurred was relevant to how plaintiff's injury occurred. Defendants argued that their causation theory was the most logical explanation because the "same thing" happened to Dein. Obviously, that the 1989 patient was injured because her bowel adhered to her abdomen made it no more or less likely that plaintiff's bowel

adhered to her abdomen. This conflation of the issues and improper use of the evidence could have been very confusing to the jury.

¶ 114 We acknowledge that a trial court's decision not to grant a new trial is entitled to deference. Here, however, the trial court began its analysis on faulty ground, stating that there was no error. And, it seemed to recognize that the jury might reasonably have returned a verdict for either party: "It was, you know, an interesting trial. There were experts on both sides. Certainly, the verdict was not against the manifest weight of the evidence. I could certainly see where the jury could decide this case in favor of the defendants, and [it] did." We agree with the trial court's assessment; neither party presented a perfect case. Plaintiff's case was weakened by a legitimate challenge to Dein's credibility, *i.e.*, that he appeared to settle on the left-trocar theory mid-deposition. In turn, defendants' case was weakened by an inability to explain with certitude how Schleicher managed to thrice pierce plaintiff's bowel through-and-through without noticing. The excision report documented that the bowel adhered to *itself*, but as defendants acknowledged at oral argument, no direct evidence documented that the bowel adhered to the *abdomen*. Given that the jury might have returned a verdict for either side, and given our analysis of the factors discussed above, we determine that a new trial is warranted.

¶ 115 Given our decision to grant a new trial, we need not address plaintiff's additional claims of error. However, we briefly address and reject plaintiff's second argument to avoid its recurrence on remand. See *Pielet v. Pielet*, 2012 IL 112064, ¶ 56.

¶ 116                                     B. Presenting Blumenthal

¶ 117 Plaintiff argues that the trial court erred in denying her motion to bar Blumenthal's testimony as cumulative. We disagree.

¶ 118 In *Taylor*, 2011 IL App (1st) 090385, ¶¶ 36, 40, relied upon by defendants, the trial court did not abuse its discretion in allowing the defendant-hospital to call one expert, a rheumatologist, and the defendant-doctor to call two experts, a rheumatologist and a neurologist. As in *Taylor*, the hospital here called one expert, and the doctor called two experts, each in a different specialty. Plaintiff makes no effort to distinguish *Taylor*.

¶ 119 Instead, plaintiff cites *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 496 (2002), which held that the trial court did not abuse its discretion in *barring* a second expert from repeating the standard-of-care testimony of the first. A discretionary ruling necessarily allows for more than one approach. And, in *Dillon*, the trial court put the parties on notice to choose their best witnesses, warning them in advance of trial that it would adopt a strict approach to the admission of cumulative testimony. The trial court here specifically addressed this timing issue, stating that, if plaintiff's motion had been made *in limine*, defendants would have had the opportunity to choose their strongest witnesses. Under the circumstances of this case, the trial court did not abuse its discretion in allowing Blumenthal to testify.

¶ 120                                     III. CONCLUSION

¶ 121 The trial court committed reversible error in allowing the defense to educe evidence of Dein's 1989 procedure under the guise that it would impeach or affirmatively elucidate Dein's standard-of-care testimony. Accordingly, we reverse and remand for a new trial.

¶ 122        Reversed and remanded.